PAYTON APARTMENTS, LTD.,
Plaintiff-Appellee,

v.

BOARD OF REVIEW OF the CITY OF DES MOINES, Iowa, et al.
Defendants-Appellants.

No. 83-478.

Court of Appeals of Iowa.

Sept. 25, 1984.

Alan A. Herrick and William R. Clark, Jr. of Herrick, Langdon & Langdon, Des Moines, for defendants-appellants.

James E. Brick of Brick, Seckington, Bowers, Swartz & Gentry, P.C. and J. Riley McManus, Des Moines, for plaintiff-appellee.

Considered by OXBERGER, C.J., and SCHLEGEL, and HAYDEN, JJ.

HAYDEN, Judge.

Defendants appeal from the district court decision lowering the property tax assessment of plaintiff's apartment complex.

Plaintiff is the owner of an apartment complex in Des Moines known as the Payton Apartments. There are two buildings, one containing thirty apartments and the other containing twenty-four apartments. There are fifteen garages as well as an asphalt parking lot. The complex was assessed at a value of $1,015,320 as of January 1, 1981. Plaintiff's protest was denied by defendant board of review. Plaintiff appealed that decision to the district court which reduced the assessment to $829,000.

In the district court plaintiff produced two expert witnesses who testified that the assessor's valuation was excessive. Tom Richards, a real estate appraiser, testified that he was unable to use the market data approach because most of the comparable sales were contract sales which needed adjustments to arrive at a true market value. He stated that he was unable to ascertain all of the information regarding those sales to make the necessary adjustments. Richards utilized both the income and cost approaches to value. In the income approach, he used the capitalization rate of fifteen percent and after adjusting the actual cash flow by the typical operating expenses, arrived at a value of $560,000. Under the cost approach, Richards estimated a replacement cost of $1,106,005 for the improvements. After subtracting a 37.5 percent depreciation and adding the value of the land, he arrived at a total replacement cost of $716,000. He testified that both approaches were valid measures of value and gave a final overall opinion of the value as $638,000.

The second appraisal witness to testify on behalf of plaintiff was Albert Margolin of Kansas City, Missouri. He testified that he had tried to use the market data approach but was unable to find normal sales

whose prices represented value. Using the cost approach, Margolin arrived at a final value of $687,444 after depreciating the cost of the improvements by approximately forty-four percent. Margolin testified that he used three different methods under the income approach, arriving at a value of $580,000. His total capitalization rate was eighteen percent. Margolin gave greatest weight to the income approach and his final evaluation of market value of the subject property was $580,000.

Defendants also produced two appraisal witnesses. The first was Harry Winegar, President of a Des Moines real estate firm. He testified that he used all three approaches to determine value. He used a depreciation rate of twenty percent and arrived at a total replacement cost of $1,117,000. Under the income approach, his estimate of value was $926,000 using a capitalization rate of .1235. Finally, Winegar found four comparable properties for the market data approach. Although three of these were contract sales and one was a mortgage assumption, Winegar testified that no adjustments were necessary for

purposes of comparison. He observed that the sales were equivalent to cash sales because of the large down payments. The value reached through the market data approach was $1,035,000. Winegar's final opinion of value based on all three appraisals was $1,030,000.

Defendants' second appraisal expert was Willard Stewart, President of a real estate appraisal company in Cedar Rapids. Stewart used a capitalization rate of 14.1 percent and estimated the value of the property to be $858,800 using the income approach. He allowed a 21.5 percent depreciation for the apartment buildings and estimated the replacement cost at $1,001,000. Using the market approach, Stewart found three comparable sales and did not make any adjustments for the fact that they were contract sales because such sales were normal and did not require adjustment. His value using the market approach was $1,080,000 and his final opinion as to value was $1,020,000.

The conclusions of the four expert appraisers are summarized as follows:

|  | Market Approach | Cost Approach | Income Approach | Final Value |
|---|---|---|---|---|
| Richards | not used | 716,000 | 560,000 | 638,000 |
| Margolin | not used | 687,444 | 580,000 | 580,000 |
| Winegar | 1,035,000 | 1,117,000 | 926,000 | 1,030,000 |
| Stewart | 1,080,000 | 1,001,000 | 858,800 | 1,020,000 |

The trial court found that the property had been excessively assessed and reduced the assessment to $829,000.

■ When a taxpayer challenges an assessment as excessive, inadequate, inequitable, or capricious, the taxpayer has the burden of proof. However, if the taxpayer "offers competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed." Iowa Code § 441.21(3) (1983). In this case, plaintiff offered competent evidence by two distin-

terested appraisers that the assessed value was excessive. Therefore, the burden of proof shifted to defendants to uphold the assessment. No presumption exists that the assessor's valuation is correct. Iowa Code § 441.39.

■ An appeal of the board's decision to the district court is heard in equity and issues before the board are triable anew. *Id.* Review of the district court decision by this court is de novo. Iowa R.App.P. 4. While we are not bound by the findings of the district court, we do give weight to them, especially where the credibility of witnesses is involved. Iowa R.App.P. 14(f)(7).

Iowa Code section 441.21 provides for the use of two approaches for ascertaining market value. If sales prices of comparable properties in normal transactions are available, the sales prices approach is to be used. If market value cannot be readily established in that manner, the other factors approach is used. *Equitable Life Insurance Co. v. Board of Review*, 281 N.W.2d 821, 823 (Iowa 1979).

Defendants argue that their experts should be believed because they used both the sales prices and other factors approaches whereas plaintiff's experts ignored the sales prices approach. Plaintiff's experts testified, however, that the sales prices approach was not feasible because there were no comparable sales which did not require extensive adjustments to reflect market value.

Iowa Code section 441.2(1)(b) provides in part:

> Sale prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or unavailability of persons interested in purchasing the property, shall be taken into consideration in arriving at its market value. In arriving at market value, sale prices of property in abnormal transactions not reflecting market value shall not be taken into account, or shall be adjusted to eliminate the effect of factors which distort market value, including but not limited to sales to immediate family of the seller, foreclosure or other forced sales, *contract sales*, discounted purchase transactions or purchase of adjoining land or other land to be operated as a unit. (emphasis added)

The supreme court has also recognized that contract sales prices should be adjusted to reflect the market value of property. *Foreman & Clark of Iowa, Inc. v. Board of Review*, 286 N.W.2d 169, 172–73 (Iowa 1979). In *Redfield v. Iowa State Highway Commission*, 252 Iowa 1256, 110 N.W.2d 397 (1961), the court considered whether contract sales should be admitted as evidence of the market value of property for purposes of condemnation proceedings. The court noted that market value refers to a sale for cash. *Id.* at 1262–63, 110 N.W.2d at 401. The court further stated:

> While we have above announced the principle that sales on contract in which part of the purchase price is to be paid in deferred installments are not necessarily to be excluded as not having any relation to fair cash market value, we think this is a rule which should be applied with considerable care. Many considerations enter into deferred payment sales which are not present when cash must be paid. The American people are characteristically users of credit; homes, automobiles, and household appliances and furniture are sold daily on long term credits with installment payments; and it is common knowledge that these purchases eventually cost the buyer more than if he could provide the cash. On the other hand, there are tax questions sometimes involved which make the vendor prefer to secure his money in several yearly payments rather than in a lump sum which might involve him with the capital gains tax or other governmental mulctings.

*Id.* at 1265, 110 N.W.2d at 402–03.

Plaintiff's first expert, Richards, testified that he did not use the market approach because he was unable to obtain enough information about the contract sales of other properties to make a reliable conclusion using that approach. He noted that in a period of high interest rates contract sales prices will always be higher than a cash sale. Margolin, plaintiff's second expert, testified that he also did not use the market approach because the only sales he found were contract sales with low down payments and nine percent wrap-around financing at a time when twenty-five percent down and sixteen percent interest was common for selling and financing the type of property involved. Margolin explained that sales with "creative financing" such as low interest rates with short-term balloon payments are not an indication of market value but are a function of viable cash flow. The contract sales price reflects the market val-

ue of the property plus an additional sum the buyer pays for the financing.

Both of defendants' expert witnesses used unadjusted contract sales as comparable sales under the sales prices approach. Winegar testified that he did not feel it was necessary to adjust the sales because contract sales with large down payments are equivalent to cash sales. He also stated that since almost all sales of apartment buildings are on contract, these sales are "normal" within the meaning of section 441.21(1)(b). Stewart also testified that he did not make any adjustments to the contract sales although he admitted that when he worked for the Department of Revenue contract sales were not used whether they were adjusted or not.

■ We believe the trial court was correct in being skeptical of the valuation reached based on unadjusted contract sales. Our statute and caselaw warn that such sales must be carefully examined to ensure they reflect the market value of the property. Furthermore, Winegar's credibility was somewhat eroded on this issue. His main reason for not adjusting the sales was the fact that they involved large down payments. He testified that the best comparable he found, Eastridge Apartments, was sold for $400,000 down, thirty-three percent of the total purchase price. On rebuttal, plaintiff called one of the buyers of Eastridge Apartments who testified that the down payment for the sale was $125,-000, little more than ten percent of the total purchase price.

■ Defendants further assert that even if the market approach is not used, their experts' valuations of the property using the income and cost replacement approaches are more credible than the valuations of plaintiff's experts. As we have noted, the trial court is in a much better position to weigh the credibility of witnesses than are we, and we will give weight to the trial court's decision on credibility even in a de novo review. Iowa R.App.P. 14(f)(7).

Under the cost approach, the main reason for the disparity in the experts' conclusions is a difference of opinion as to the depreciation factor. Defendants' witnesses testified that the property was in fair to good condition whereas one of plaintiff's witnesses testified that the property was in poor condition and the other testified that it was in normal condition for that type of construction. We conclude that there was sufficient evidence of problems with the building construction that the trial court could find the higher depreciation rate more appropriate.

Under the income approach, the main variance among the appraisers was the capitalization rate. The trial court found a rate of .15 was the most credible. We do not dispute this conclusion. This rate was between the extremes of .18 and .1235 and was very close to the fourth expert's opinion of .141. The trial court found the income approach to be the most revealing of market value and arrived at a value of $829,000. After reviewing the entire record de novo, the decision of the trial court is affirmed.

AFFIRMED.