**POST–NEWSWEEK CABLE, INC., d/b/a Sooland Cablecom, Appellee,**

v.

**BOARD OF REVIEW OF WOODBURY COUNTY, IOWA, and Wayne Luse, Chairman of the Board of Review and a Member Thereof, Appellants.**

**POST–NEWSWEEK CABLE, INC., d/b/a Sooland Cablecom, Appellee,**

v.

**BOARD OF REVIEW OF CITY OF SIOUX CITY, IOWA, and Ron Craig, Chairman of the Board of Review and a Member Thereof, Appellants.**

No. 91–1010.

Supreme Court of Iowa.

March 24, 1993.

Brigit M. Barnes, Asst. County Atty., for appellants Woodbury County and Wayne Luse.

Charles D. Hunter of Belin Harris Lamson McCormick, A Professional Corp., Des Moines, for appellants Sioux City and Ron Craig.

Bonnie J. Campbell, Atty. Gen., Harry M. Griger, Sp. Asst. Atty. Gen., and James D. Miller, Asst. Atty. Gen., as amicus curiae, for Gerald D. Bair, Director of the Iowa Dept. of Revenue and Finance, in support of appellants.

Mark Schuling of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, for appellee.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, LAVORATO, and SNELL, JJ.

LAVORATO, Justice.

After unsuccessful tax protests to the city and county boards of review, the taxpayer appealed its real estate tax assessments to the district court. The assessments in question are for the year 1989 on certain cable television property located in the Sioux City and Woodbury County assessing jurisdictions. The district court reduced the assessments, and the boards of review and their chairpersons appealed to this court. We affirm.

The questions in this case concern burden of proof, methods of valuation, and the amount of the valuations.

Post–Newsweek Cable, Inc. owns Sooland Cablecom, a cable television system in Woodbury County. The system provides service to Sioux City and Woodbury County. The taxable assets subject to the tax protests consisted of trunk and distribution systems (identified as RF distribution systems), head end equipment and microwave equipment.

The assessments for 1989 yielded a combined figure in excess of $5,500,000. This figure was then allocated between the city of Sioux City and Woodbury County based upon subscriber information. The property for the county was assessed at $162,344. The property for the city was assessed at $5,500,000.

Post–Newsweek objected to these assessments as excessive and filed protests with the boards of review of the city of Sioux City and Woodbury County. See Iowa Code § 441.37 (1989). The boards affirmed the assessments. Post–Newsweek then sought separate reviews of these assessments by the district court. See Iowa Code §§ 441.38, 441.39.

The district court ordered the cases consolidated by agreement among the parties. After a trial de novo, the court found the assessments excessive and decreased the combined assessment to $2,000,000. See Iowa Code §§ 441.39, 441.43. Based on a stipulation among the parties, the court then allocated 96.86% of the assessment to the city and 3.14% of the assessment to the county.

The boards and their chairpersons then filed this appeal.

■ Our review is de novo. *Richards v. Hardin County Bd. of Review*, 393 N.W.2d 148, 150 (Iowa 1986). We give the

district court's fact findings consideration—especially as to witness credibility—but we are not bound by them. Iowa R.App.P. 14(f)(7). We decide the ultimate issues involved. *Equitable Life Ins. Co. v. Board of Review*, 281 N.W.2d 821, 827 (Iowa 1979). In doing so, we—like the district court—follow the statutory rule that "there shall be no presumption as to the correctness of the valuation of assessment appealed from." Iowa Code § 441.39.

I. *Burden of Proof.*

 In tax assessment cases such as this one,

[t]he burden of proof shall be upon any complainant attacking such valuation as excessive, inadequate, inequitable or capricious; however, in protest or appeal proceedings when the complainant offers competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed.

Iowa Code § 441.21(3). The burden of proof referred to is one of persuasion. *Wunschel v. Board of Review*, 217 N.W.2d 576, 578 (Iowa 1974). If the complainant fails to shift the burden of proof, the complainant must prove by a preponderance of the evidence that the challenged valuation is excessive, inadequate, or capricious. *Id.*

The defendants—the boards and their chairpersons—contend that one of Post–Newsweek's two experts, Don Turlington, was not a disinterested witness. For this reason, the defendants argue, the burden of proof did not shift to them to uphold the valuation.

Post–Newsweek engaged Turlington as an independent consultant to file compliance information with the Sioux City assessor and the Woodbury County assessor. The information furnished was historical and was not accompanied by any opinions by Turlington.

Turlington had no financial interest in the assessments for which the city and county assessors were responsible. Nor

did Turlington make the decision to appeal the assessments to the boards of review. Roughly ten percent of his work, however, comes from Post–Newsweek.

An attorney represented Post–Newsweek before the two boards. Turlington did appear as an expert witness for Post–Newsweek at the hearings before the boards.

On appeal to the district court, Post–Newsweek's attorney—not Post–Newsweek—engaged Turlington as an expert. The attorney had used Turlington as an expert before.

 "Disinterested witnesses" in Iowa Code section 441.21(3) is not defined. So we are obliged to give the term its ordinary meaning. *See State v. Hennenfent*, 490 N.W.2d 299, 300 (Iowa 1992). One dictionary defines disinterested witness as "one who has no interest in the cause or matter in issue, and who is lawfully competent to testify." Black's Law Dictionary 468 (6th ed. 1990). "Interest" is defined as "[t]he most general term that can be employed to denote a right, claim, title, or legal share in something." *Id.* at 812. Putting the two definitions together, we have the following definition of disinterested witness: One who has no right, claim, title, or legal share in the cause or matter in issue, and who is lawfully competent to testify.

 There is no record evidence that Turlington had any proprietary interest in the appeal at the time he testified. Nor is there any contention that he was not competent to testify. In our de novo review, we find that Turlington was a disinterested witness when he testified. Thus two disinterested witnesses testified that the market value of the taxable assets was less than the assessor's valuation. The burden of persuasion was therefore on the defendants to uphold their valuation of the subject properties to be assessed. *Wunschel*, 217 N.W.2d at 578.

II. *Methods of Valuation.*

A. *Applicable law.* For the purposes of Iowa Code chapter 441, assessable property includes "all real and tangible person-

al property subject to taxation." Iowa Code § 441.21(1)(a). Such property must be assessed "at its actual value." *Id.*

Iowa Code section 441.21(1)(b) defines the actual value of assessable property as "the fair and reasonable market value of such property." That section defines market value as

> the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property.

Iowa Code § 441.21(1)(b). In arriving at a property's market value, an assessor must take into consideration the "sale prices of the property [itself] or comparable property in normal transactions reflecting market value." *Id.*

If the market value of the property being assessed is undeterminable by these means, then the assessor

> may determine the value of the property using the other uniform and recognized appraisal methods including the productive and earning capacity, if any, industrial conditions, its cost, physical and functional depreciation and obsolescence and replacement cost, and all other factors which would assist in determining the fair and reasonable market value of the property.

Iowa Code § 441.21(2). The actual value, however, shall not be established by the use of only one such factor. *Id.* We explained this last requirement works this way in an assessment appeal—like the one here—under Iowa Code section 441.39:

> [A] court, in considering an assessment appeal under section 441.39, is free to give no weight to proffered evidence of comparable sales which it finds not to be reflective of market value. An appealing party's attack on an assessment confirmed by the board of review is a two-stage process. In the first stage, the party challenging the assessment is required to show that the board of review's valuation is excessive, inadequate, inequitable, or capricious. In the second stage,

that party must establish what the correct valuation should be. A party whose litigating theory in stage one is based on showing that one appraisal technique is singularly better suited than other appraisal techniques in arriving at market value *need not in stage two proffer evidence of value under those theories which it brands as unreliable.*

*Heritage Cablevision v. Board of Review,* 457 N.W.2d 594, 597–98 (Iowa 1990) (emphasis added) (citations omitted).

■ While real property and tangible personal property are assessable and taxable as real estate, intangible property is not. Iowa Code § 441.21(1)(a) (assessable property includes "all real and *tangible* personal property subject to taxation") (emphasis added); *Heritage Cablevision,* 457 N.W.2d at 598. Although intangible property is not to be separately valued and assessed, the assessor can—except for intangibles listed in Iowa Code section 441.-21(2)—*consider* intangibles in arriving at the actual value of the taxable property. Iowa Code section 441.21(2) is clear on this point because it authorizes the assessor to consider "all other factors which would assist in determining the fair and reasonable market value of the property." Iowa Code § 441.21(2). Section 441.21(2), however, expressly *prohibits* the assessor from considering the following intangibles under *any* valuation methodology: "[s]pecial value or use value of the property to its present owner, and the good will or value of a business which uses the property as distinguished from the value of the property as property." Iowa Code § 441.21(2); *Heritage Cablevision,* 457 N.W.2d at 599.

B. *Analysis.* With the above principles in mind, we turn to the record evidence in this case.

In 1989 the Iowa State Association of Assessors created a "Manual for Assessment for Cable Television Property." This manual was distributed statewide to all city and county assessors. Through the manual, its authors were attempting to develop a uniform methodology for valuing cable television property across Iowa.

The manual advocates a property assessment system that "combines" two methods of valuation: replacement cost less depreciation [hereinafter cost] and income. Before this, taxable property belonging to cable television companies apparently was valued exclusively under variations of the cost method. Under the new method, the assessment of Post–Newsweek's property was approximately doubled.

The new manual approach works this way. First, the assessor "values" the property using the cost approach. Under this approach, the assessor obtains the cost of the taxable property per component and then deducts depreciation to arrive at a market value figure.

The assessor then values the property using the income approach. Under this approach the assessor gathers income and expense data concerning the cable television business under consideration. The net income thus determined is capitalized at an acceptable rate of return to arrive at a second market value figure.

Under the manual's premise, neither valuation method—standing alone—produces a satisfactory approximation of market value for cable television property. According to this premise, the cost method is flawed because it fails to consider the fact that the taxable assets are part of an income-producing concern. And, as such, these assets are enhanced by certain intangibles of the business which, though they may not be separately valued and assessed, may be considered under Iowa law in arriving at market value.

By the same token, the income method is flawed—the premise continues—because it excessively enhances the value of the taxable property. The excessive enhancement occurs because the income method values *all* of the intangibles, including those that may not be considered under Iowa Code section 441.21(2).

According to the authors of the new manual, they have a solution to this problem. The manual directs the assessor to take one-half of the valuation reached under the cost approach and one-half of the valuation reached under the income approach and add the two resulting numbers together for a final market value. This results in a fifty percent weight being assigned to each approach. By correlating the two approaches in this manner, the authors assume a good indicator of value is achieved because allowable intangibles are considered and unallowable intangibles are excluded.

The assessor for the city of Sioux City followed this "fifty-fifty logic" approach for the January 1, 1989, assessment. The cable system properties within the two jurisdictions were valued together. The cost method yielded an average figure of $2,000,000 while the income method yielded a figure of $9,175,000. Reducing each figure by fifty percent and adding the results yielded an adjusted final assessment valuation in excess of $5,500,000. The Woodbury County assessor approved of this assessment after its completion.

The parties' respective positions on appeal remain unchanged from the positions they took in the district court. There, Post–Newsweek successfully championed the cost method as the more reliable way to arrive at the fair market value of the taxable assets for assessment purposes. Post–Newsweek continues to rely on that method here.

The defendants, on the other hand, maintain that this method is not a perfect indicator of value because it does not take into account the enhanced value that tangible property gains because of its use as a part of a going concern. The defendants argue that the only way to factor in this enhanced value is by using the income method alongside the cost method as the assessor did here.

In addition, the defendants say, it is inappropriate to use only the cost method to value Post–Newsweek's taxable assets because Post–Newsweek has no competitors in Sioux City. The defendants characterize Post–Newsweek as a natural monopoly. They point out that once a governmental unit grants a franchise to a cable television system, would-be competitors generally do not enter the market because of the costly

initial investment to do so. (Such franchises are generally non-exclusive.)

■ The defendants insist that because Post–Newsweek is a natural monopoly, the substitution principle—which underlies the cost approach—does not apply. This principle holds that no one would be willing to pay more for a particular property than the cost of replacing it. I James Bonbright, *The Valuation of Property* 156–57 (1st ed. 1937) [hereinafter Bonbright]. It has been said that

> [r]ecognition of this principle of substitution has led appraisal writers to lay down the rule that the replacement cost of property ordinarily sets the approximate *upper limit* of its value....
>
> ....
>
> The maxim that the replacement cost of property sets the approximate upper limit of its value is the most useful rule of thumb in the entire field of appraisal. Were it not for its implications, a single lead pencil or safety pin might be valued at $10,000, and a shanty might be appraised at the price of a palace.

*Id.* at 157.

The defendants maintain that this substitution principle only applies when it makes sense to build a duplicate of the property in question. Here—the defendants strenuously argue—two important factors militate against building a duplicate cable television system: the monopolistic aspect of Post–Newsweek's system and the heavy initial investment cost.

One court described the cable television industry this way:

> The cable television industry is capital-intensive in the same manner as the gas, telephone, electric, water, and other public utilities. The capital-intensive nature of the cable industry generally precludes situations in which a second cable operator constructs another cable system to serve and compete for the same subscribers in the same franchise area. Such competition would generally result in neither cable television system operator earning a fair return on its investment. Thus, competing cable systems are generally not constructed, even in areas

where the franchising authority desires a second cable system.

> Although each franchise in question did not provide an "exclusive" right for petitioner to operate a cable television system, in economic reality there was no possibility that a competitor could construct and operate another cable system with any realistic hope of financial success. Petitioner, therefore, enjoyed a de facto or natural monopoly for its services in each area in which it held a franchise because, if a resident of the municipality wanted "cable television," i.e., distant television station signals or system-originated programming, the resident would have to subscribe to petitioner's cable system.

*Tele–Communications, Inc. v. Commissioner,* 95 T.C. 495, 501–02 (1990).

We think this description accurately portrays Post–Newsweek's status. At the trial no one disputed the fact that the cable television industry is capital intensive. In addition, Post–Newsweek is the only cable television operator in Sioux City although its franchise is nonexclusive. No other competitors have tried to obtain a franchise from the city of Sioux City since Post–Newsweek was granted its franchise.

Since 1986 Post–Newsweek has been enjoying tremendous profits. The evidence suggests that this has happened for two reasons. The first one is obvious: Post–Newsweek is a natural monopoly. The second reason stems from the fact that since 1986 federal law has preempted local governments from regulating rates cable television systems can charge.

■ Tremendous profits and a monopolistic status do not, however, justify taxation of intangibles. The income approach—which capitalizes earnings—measures the value of a business entity, not the value of individual taxable assets of that entity. Bonbright at 490–91 n. 84. This calculation necessarily values intangibles.

Here the income approach played a substantial role in determining the fair market value of the taxable assets belonging to Post–Newsweek. It is true the assessor

discounted the method by fifty percent. But the defendants offered no convincing evidence to show whether this discounting removed the value attributable to intangibles. That is why we, like the district court, find the fifty-fifty logic method unreliable. As the district court wisely noted, "there is insufficient evidence that [the use of the fifty-fifty logic approach] results in the fair allocation of income between tangible and intangible assets."

The assessor's market valuation in excess of $5,500,000 for Post–Newsweek's taxable assets under the income approach is over $3,000,000 more than the valuation under the cost approach. This suggests that a substantial amount of the income capitalized under the income approach was produced by nontaxable assets.

Like the district court, we find the testimony of the defendants' two experts unconvincing. Each professed that he applied the income approach, valuing the business entity and then allocating a portion of that value to taxable assets. Like the assessor, these experts found that the final market valuation of taxable assets was in the neighborhood of $5,500,000.

These two experts produced valuations for the entire business that differed by almost $5,000,000 ($20,600,000–$15,971,000). This discrepancy can probably be accounted for by the divergent routes each took in arriving at their figures. Ronald Nielsen, one of the defendants' experts, computed the value of the business under the income approach. By this method he arrived at a value of $20,600,000. He apportioned this $20,600,000 to each asset—taxable and nontaxable—on the basis of the value attributed to those assets in a 1986 appraisal report made by a major accounting firm. The valuation of the taxable assets in the 1986 appraisal report was based upon a replacement cost valuation. Based upon this apportionment, Nielsen arrived at a valuation for taxable assets of about $5,400,000 after adjustments.

The defendants' other expert, Dr. Francis Colella, did not value the taxable assets. Instead, he valued the entire business using the income approach. This yielded a figure of about $15,900,000. He then valued the intangibles, using the income method, and arrived at a figure of $4,300,000. He subtracted this $4,300,000 from the total value of the business, $15,900,000. The difference is $11,600,000. This $11,600,000 allegedly represents the value of all the tangible assets—those included in the assessment and those not included in the assessment. He allocated this $11,600,000 among all of these assets. This allocation was based upon the book value of these assets taken from the company's records. Based upon this allocation he arrived at a market value for taxable tangible assets of about $5,500,000.

Even if the difference between the experts' values for the total business could be reconciled, these figures are between $11,400,000 and $6,700,000 above what the assessor calculated the business was worth under the income method. The assessor valued the business at about $9,200,000. We find these differences substantial.

In assessing the evidence, we—like the district court—are mindful of our advice in *Heritage Cablevision:*

> When the varying techniques produce divergent valuations, it does not necessarily follow that market value is accurately divined by averaging the divergent results or in applying the divergent results under arbitrarily weighted formulas. A trier of fact deciding an appeal under section 441.39 may be better served in such situations by accepting that evidence which it finds to be most reliable and rejecting that which is determined to be unreliable.

*Heritage Cablevision,* 457 N.W.2d at 598.

■ Under the Iowa Code and our prior case law, excluding the value of intangibles is critical to the legitimacy of any method used to value property. *See* Iowa Code § 441.21(2); *Heritage Cablevision,* 457 N.W.2d at 599. We reject the notion that intangibles were not included in the original assessments here. The evidence clearly establishes that the value of certain intangibles was included in the assessor's calculation, as well as in those of the two experts called by the defendants.

## III. *Amount of the Valuations.*

 The district court was left with valuations arrived at under the cost approach. The assessor used two cost approaches, adjusted to reflect the market conditions in Sioux City and Woodbury County. He determined market value of taxable assets under the first method at $2,137,529 and under the second method at $1,911,067. Post–Newsweek's experts determined the market value of taxable assets under the cost approach at $2,082,617 and $2,229,135.

Like the district court, we find the evidence supporting the use of the cost approach is more reliable than the evidence concerning the methods of valuation used by the assessor and the defendants' experts. We adopt the district court's valuation of $2,000,000 as correctly reflecting the market value of the taxable assets here and affirm its judgment.

**AFFIRMED.**