# IN THE COURT OF APPEALS OF IOWA

––––––––––––––––––

No. 25-1342
Filed June 24, 2026

––––––––––––––––––

**Walmart, Inc., Sam's Real Estate Business Trust, and
Wal-Mart Real Estate Business Trust,**
Plaintiffs–Appellants,

v.

**City of Ames Iowa Board of Review,**
Defendant–Appellee.

––––––––––––––––––

Appeal from the Iowa District Court for Story County,
The Honorable John J. Haney, Judge.

––––––––––––––––––

**AFFIRMED**

––––––––––––––––––

Paul J. Esker (argued), Paul D. Burns, and Olivia A. McGovern of
Bradley & Riley PC, Iowa City, attorneys for appellants.

Brett Ryan (argued) of Watson & Ryan, PLC, Council Bluffs,
attorney for appellee.

––––––––––––––––––

Heard at oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Badding, J.

1

**BADDING, Judge.**

Imagine two storefronts, each with a "For Sale" sign posted in its window. The properties are identical in every respect but one: Store #1 is owned and occupied by a successful business that will vacate at the time of sale. Store #2 comes with a long-term lease to a creditworthy tenant who pays below-market rent. According to Walmart[1]—who raised a version of this hypothetical at oral argument—a rational buyer would pay more for Store #2, because that store comes with a guaranteed income stream. The other is just "bricks and sticks."

In a real-world transaction, that analysis might be right. Real estate investors must account for the cost and risk in making an empty building profitable again. But when it comes to the art of property valuation, our law allows assessors to set those worries aside. Rather than appraising commercial real estate as if it were vacant, they may treat it "as a going concern" and "consider conditions as they are." *Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 788 (Iowa 2009) (citations omitted). And viewed through that lens, the lease on Store #2 looks more like a burden than a benefit. What buyer, when offered the chance to stand in the shoes of Store #1's current owner, would choose an underperforming lease instead?

This case involves similar economics at a larger scale. Walmart challenges the district court's order denying its tax assessment appeals for three big-box retail stores. At the heart of the parties' dispute is a methodological question that has sharply divided the appraisal industry, and one which we have declined to take up in past appeals. Citing diverging outcomes in its protests across the state, Walmart urges us to take a clear

---

[1] We refer to the named plaintiffs—Walmart, Inc., Sam's Real Estate Business Trust, and Wal-Mart Real Estate Business Trust—collectively as "Walmart."

stance on its theory that owner-occupied properties must be assessed on a "fee simple" basis rather than on "a hypothetical assumption that the property is leased at market rates." We accept that invitation, reject Walmart's argument, and uphold the assessments at issue.

## I. Factual and Procedural Background

Walmart owns three commercial properties in the City of Ames. A property at 305 Airport Road features a 115,596-square-foot[2] Sam's Club situated on a 16.4-acre lot. A property at 3105 Grand Avenue features a 156,833-square-foot Walmart Supercenter on a 14.5-acre parcel. And a property at 534 South Duff Avenue features a 215,689-square-foot supercenter on a 22.6-acre lot. All three properties are owned and occupied by Walmart, which uses them to operate its retail business.[3]

In 2023, the city assessor increased the tax assessments for each of Walmart's properties, valuing the stores at $9,704,200 (Airport Road), $17,574,600 (Grand Avenue), and $21,227,200 (South Duff Avenue). Walmart challenged the assessments before the Ames Board of Review, but the Board denied relief.[4] *See* Iowa Code § 441.37(1)(a)(1) (2023). Walmart appealed to the district court, *see id.* § 441.38, which heard testimony from three commercial real estate appraisers at a consolidated bench trial in

---

[2] This number comes from the report of Walmart's appraiser, Chris Jenkins. Its other appraiser, Gerald Maier, listed the property's square footage at 115,338.

[3] According to the property card in our record, the titleholder for the Grand Avenue property is "Ames Iowa, LLC," doing business as "Walmart." It is unclear how this company is related to the named Walmart entities who operate the Grand Avenue supercenter. That said, there is no dispute between the parties that all three properties are functionally, if not factually, owner-occupied.

[4] Walmart also challenged a 2024 assessment at the Airport Road property. But the parties entered a stipulation about that assessment, and it is not at issue in this appeal.

March 2025. Walmart's experts, Gerald Maier and Chris Jenkins, opined that the market value of each store was millions of dollars less than the value assessed. Board expert Mark Kenney opined that each property's value was greater by a million dollars or more.

Methodology was the fighting issue at trial. Walmart argued that Kenney's sales-comparison analysis, which sought to establish the market value of the properties through transactions involving leased big-box stores, "failed to comply with Iowa law because he did not value the subject properties" as though they were "owner-occupied." Specifically, Walmart argued that by failing to "subtract the independent value added by the leases" from his comparator sales, Kenney improperly inflated his valuation of Walmart's properties. The district court rejected this theory, crediting Kenney's valuation over those of Maier and Jenkins. Walmart now appeals.

## II.    Standard of Review

A taxpayer's direct appeal from a local board of review is triable in equity, so our review is de novo. Iowa Code § 441.38(3); *Story Cnty. Wind, LLC v. Story Cnty. Bd. of Rev.*, 990 N.W.2d 282, 285 (Iowa 2023). Although they are not binding, we give weight to the district court's factual findings, especially when they concern credibility of witnesses. *Nationwide Mut. Ins. Co. v. Polk Cnty. Bd. of Rev.*, 983 N.W.2d 37, 42 (Iowa 2022).

## III.    Analysis

### A. Property Assessment Principles

Under Iowa's property tax assessment scheme, taxable property must be assessed at its "actual value," which means its "fair and reasonable market value." Iowa Code § 441.21(1)(a), (b). "Market value" is defined as the "fair and reasonable exchange in the year in which the property is listed and valued

between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property." *Id.* § 441.21(1)(b)(1).

Section 441.21 describes two approaches for assessing a property's market value: the "comparable sales" approach and the "other factors" approach. *See Compiano v. Bd. of Rev. of Polk Cnty.*, 771 N.W.2d 392, 396 (Iowa 2009). The comparable-sales approach—which seeks to determine market value by reference to actual sales of similar properties—is the preferred method of valuation. Iowa Code § 441.21(1)(b)(1) ("Sale prices of the property or comparable property in normal transactions reflecting market value . . . shall be taken into consideration in arriving at its market value."). If market value "cannot be readily established" through the comparable-sales method, then assessors may rely on "other uniform and recognized appraisal methods," including income-capitalization and cost analyses. *Id.* § 441.21(2). In this case, both parties (and all their appraisers) agree that the value of Walmart's properties can be determined by sales comparison.

When applying the sales comparison approach, assessors must strive to select "normal transactions reflecting market value." *Id.* § 441.21(1)(b)(1). These sales need not involve identical properties, but they must be "sufficiently similar" when considering relevant factors such as the size, use, location, and character of the property and the nature and timing of the sale. *Soifer*, 759 N.W.2d at 783. To the extent a comparator property is dissimilar, or sold under circumstances "which distort market value," the assessor must make adjustments to "eliminate the effect of [those] factors." Iowa Code § 441.21(1)(b)(1).

## B. Valuation as a "Going Concern"

An assessment must reflect the market value "of the property as property"—not the "[s]pecial value or use value of the property to its present owner" or the "value of a business which uses the property." Iowa Code § 441.21(2). Excluding these prohibited intangibles is "critical to the legitimacy of any method used to value property." *Post-Newsweek Cable, Inc. v. Bd. of Rev. of Woodbury Cnty.*, 497 N.W.2d 810, 817 (Iowa 1993). Yet the line between "special value" and "property as property" is not always well-defined. *See Wellmark, Inc. v. Polk Cnty. Bd. of Rev.*, 875 N.W.2d 667, 672–73 (Iowa 2016). This is especially true for commercial real estate, as "[t]he fact that a valuable going concern is located on the property" can increase its value. *Id.* at 681 (citing *Soifer*, 759 N.W.2d at 788).

On several occasions, our supreme court has been asked to decide whether a property assessment was improperly inflated by the "[s]pecial value . . . of the property to its present owner." Iowa Code § 441.21(2). One landmark case was *Maytag Co. v. Partridge*, 210 N.W.2d 584 (Iowa 1973), where an appliance manufacturer alleged its machines were assessed for more than they could fetch on the used-equipment market. The court rejected that claim, explaining the property was not a pile of scrap but "a complete line of machinery, in place and functioning [as] an integral part of a profitable manufacturing establishment." *Maytag*, 210 N.W.2d at 589. "Presumably," the court wrote, "another competent home appliance manufacturer could step into Maytag's shoes and operate this plant." *Id.* at 591. So, it found nothing wrong with assessing the assembled machinery at a price greater than the sum of its parts. To do otherwise would ignore "conditions existing at the time of valuation." *Id.* at 589.

These principles were reaffirmed in *Merle Hay Mall v. City of Des Moines Bd. of Review*, 564 N.W.2d 419, 422 (Iowa 1997). There, a mall owner argued its property valuation had been inappropriately inflated by the mall's "business enterprise value," including the value of its "assembled work force," "name recognition," and "ability to attract [stores]." *Merle Hay Mall*, 564 N.W.2d at 424. The owner urged the supreme court to extract the value of these intangibles from its assessment. But the court declined to do so, finding the mall owner's theory "inconsistent with Iowa's statutory scheme because it strips labor, capital, and entrepreneurial components from the mall's value" and "removes virtually all components of value except the value of the land and buildings." *Id.* The court noted that if the legislature had intended to limit market value in that way, then it "would simply have provided that the sole means of valuation would be the cost method." *Id.*

More recently, in *Soifer*, owners of a property housing a McDonald's restaurant challenged the assessor's comparable-sales valuation, arguing it had improperly relied on "franchise-to-franchise" sales. 759 N.W.2d at 781. They offered a competing appraisal based on sales of restaurant properties that did not involve a transfer between one fast-food franchise and another. *Id.* at 784–85. The owners asserted these sales were more comparable because—under the owners' franchise agreement—any transfer of their property would include a restrictive covenant preventing its use as a fast-food franchise. *Id.* at 788. The court disagreed, explaining that assessing the property "as if it were not a viable McDonald's would be contrary to the principle that assessed property is valued based on its present use, including any functioning commercial enterprise on the property." *Id.* In other words, "an assessor is entitled to consider the use of the assessed property as a going concern." *Id.* (cleaned up).

## C. "A hotly contested issue in the appraisal industry."

This case involves the application of the going-concern principle to the valuation of a specific kind of commercial property: expansive, single-occupant retail buildings known as "big-box" stores. Valuing these properties presents unique challenges, particularly when it comes to identifying comparable sales. While big-box stores do change hands, these transactions rarely—if ever—involve a new owner who takes the place of the former in both title and use.[5] Rather, they typically take one of two forms: either (1) the property is purchased as vacant commercial real estate for "second-generation" retail use; or (2) the property is purchased by an investor subject to a lease arrangement with the preexisting retailer. Everyone agrees that in the latter scenario, the terms of the retailer's lease can affect the purchase price. Vacant stores, by contrast, often sell for less.

A problem arises when an assessor must determine the value of a big-box store that is neither vacant nor under lease—which is the case for each of Walmart's properties here. Our law requires that market value be based on comparable sales that mimic the "conditions existing at the time of valuation." *Maytag*, 210 N.W.2d at 589. But in this owner-occupied context, the necessary data is missing. As one appraiser agreed at trial, "it's not realistic to find a property that continues operating [as] big-box retail that . . . [is] not sold subject to a lease." Given that reality, should a sales-comparison valuation look to sales of leased big-box stores that continued their retail use?

---

[5] One reason for this has to do with market size. As both parties' experts agreed, there are simply not many retailers suited to occupy properties as expansive as Walmart's. Another reason is competitive: a big-box retailer is not likely to entertain a transaction that benefits a direct competitor. Indeed, the record suggests that Walmart has previously sold real estate subject to use restrictions that prohibit future retail business similar to Walmart's.

Or should it look to sales of vacant big-box stores that stayed owner-occupied? Choosing between these imperfect analogues is a "hotly contested issue in the appraisal industry." *Walmart, Inc. v. Dallas Cnty. Bd. of Rev.*, No. 21-1831, 2023 WL 2670039, at *4 (Iowa Ct. App. Mar. 29, 2023).

### D. Three Competing Approaches

The experts who testified in this case used three approaches to the owner-occupied problem. Walmart's appraisers, Maier and Jenkins, used sales comparisons that prioritized the unleased status of Walmart's properties. For Maier, this meant relying exclusively on comparator sales that involved unoccupied commercial buildings—many of which sold following multi-year vacancies. Jenkins, by contrast, started with transactions involving leased big-box stores. He then reduced the sale prices of these properties by margins between 5% and 30%, depending on the value he ascribed to each lease. Jenkins testified that his adjustments were designed "to eliminate the impact of those lease terms" on the sale prices and "to try to get down to just the real estate value."

Kenney took a different approach, focusing his analysis on the value of Walmart's properties as "going concerns." Like Jenkins, Kenney referenced sales of big-box stores that transferred under lease. But unlike Jenkins, he did not attempt to remove the value of the leases from these sales. Instead, Kenney made adjustments to account for the value of the leases relative to market rates. His appraisals thus predicted the value of Walmart's properties in a hypothetical sale where Walmart would continue to occupy them under a market-rate lease.

The various methods applied by Maier, Jenkins, and Kenney produced drastically different valuations:

|            | Maier        | Jenkins      | Kenney       | Assessed     |
|------------|--------------|--------------|--------------|--------------|
| Airport Rd. | $6,340,000 | $7,300,000 | $11,500,000 | $9,704,200 |
| Duff Ave. | $14,000,000 | $12,500,000 | $22,200,000 | $21,227,200 |
| Grand Ave. | $11,750,000 | $11,000,000 | $18,000,000 | $17,574,600 |

Faced with these competing appraisals, the district court found Kenney's most credible, explaining his approach was the only one that properly accounted for the "value in use" of the properties. Walmart challenges that conclusion on legal and factual grounds.

### E. Burden of Proof

Before reaching Walmart's claims, we must first resolve the parties' dispute about the burden of proof. Generally, it is the taxpayer's burden to prove an assessment is excessive. Iowa Code § 441.21(3)(b)(2). But if the taxpayer "offers competent evidence that the market value of the property is different than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed." *Id*. Evidence is competent "when it complies with the statutory scheme for property valuation." *Compiano*, 771 N.W.2d at 398 (cleaned up). This means a taxpayer must put forward a valuation that relies on "sufficiently similar" comparators. *Soifer*, 759 N.W.2d at 782–83.

Walmart contends the testimony of Maier and Jenkins satisfied its burden to produce competent evidence. We agree. These experts provided competing valuations based on sales of sufficiently similar properties. The Board asserts Maier and Jenkins used sales and adjustments that ignored the going-concern rule and deflated the properties' value. But that worry goes to

the weight of the valuations rather than their competency. *See id.* at 784 (explaining that where properties are reasonably similar, "it is better to leave the dissimilarities to examination and cross-examination" (citation omitted)). We reject the Board's suggestion that the burden-shifting analysis swallows all of the parties' disputes. *See Nationwide*, 983 N.W.2d at 42 (instructing courts not to graft "too rigid a standard" onto the competent evidence requirement). The burden was on the Board to uphold its assessments.

### F. Kenney's Methodology

We now turn to the issue at the center of this case. Walmart contends Kenney's valuations cannot support the Board's assessments because his comparative-sales analysis was flawed. It argues "commercial properties encumbered by long-term leases with creditworthy tenants are not directly comparable to properties occupied by their fee simple owners," so section 441.21 required Kenney to extract any lease value from the sale price of his comparators. Walmart asserts that Kenney's failure to make these adjustments resulted in exaggerated appraisals that predict the value of Walmart's stores under hypothetical leases—not their value as owner-occupied properties.

This is not the first time Walmart has asked us to reject Kenney's approach as a matter of law. In a previous appeal involving the same experts and a West Des Moines supercenter, Walmart argued that Kenney's approach was flawed because it did not "remove the independent value" of the leases from the comparable sale prices. *Dallas Cnty.*, 2023 WL 2670039, at *4. We declined "to get too far into the weeds" on that methodological question, reasoning "neither section 441.21 nor case law prohibits the use of vacant or leased properties as comparables, *so long as suitable adjustments are*

*made* to take the status of the property into account." *Id.* (emphasis added). We then reviewed Kenney's testimony in support of his appraisals, finding that he "did account for the value added by the properties' leases." *Id.* Thus, we affirmed the district court's denial of relief.[6] *Id.* at *6.

This case beckons us into the weeds we tried to avoid. Walmart contends that *Dallas County* "agreed with Walmart on the law but took a different view of the facts." The Board, on the other hand, reads our holding as a full-bodied endorsement of Kenney's approach. We acknowledge the confusion—*Dallas County* stopped short of explaining why Kenney's particular adjustments sufficed. *See id.* at *4. Walmart now asks us to clarify whether the "suitable adjustments" we described require an assessor to remove the "independent value" of a lease before relying on a comparable sale. To set the record straight: we find no such requirement.

Section 441.21 instructs assessors to estimate market value by looking to the sale price of "comparable property in normal transactions." Where a comparable sale is abnormal, its price must be "adjusted to eliminate the effect of factors which distort market value." Iowa Code § 441.21(1)(b)(1). The statute lists several price-distorting circumstances, "including but not limited to sales to immediate family of the seller, foreclosure or other forced sales, contract sales, discounted purchase transactions or purchase of

---

[6] The same issue returned to our court earlier this year in a tax appeal challenging Kenney's appraisal of a Walmart in Marshalltown. *See Walmart, Inc. v. Marshall Cnty. Bd. of Rev.*, No. 24-1964, 2026 WL 886741 (Iowa Ct. App. Apr. 1, 2026). Citing *Dallas County*, we reiterated that a sales comparison may look to either leased or vacant properties, provided that "suitable adjustments" are applied. *Id.* at *2 (citation omitted). We thus "confine[d] our review to whether Kenney made the necessary adjustments." *Id.* And once again, we found Kenney had considered "the impact of a lease and the necessary adjustments for each comparison property." *Id.* at *3.

adjoining land or other land to be operated as a unit." *Id*. We have explained that an "advantageous" or "disadvantageous" lease can impact sale price in a similar way. *Dallas Cnty.*, 2023 WL 2670039, at *4; *accord Wellmark*, 875 N.W.2d at 682 (explaining comparability is clouded where it is unclear whether a "buyer was interested in the property or the income stream generated by an advantageous lease").

But adjusting for the effects of an advantageous or disadvantageous lease is different from removing the "value attributable to a lease" itself, which is what Walmart claims Kenney needed to do. That argument presumes that the existence of a lease necessarily increases market value—a point on which we cannot agree. There are no doubt circumstances where, as Walmart contends, "a near-guaranteed income stream" from "a locked-in, stable tenant" will drive up a property's price on the open market. But it's not hard to imagine other scenarios. Consider a property under lease to a charitable organization at one dollar per year. Must an assessor adjust down for the "independent value" of that arrangement? Surely not. Such an unprofitable lease would add no value in an arm's-length sale. It would subtract.

To expand the illustration, imagine a lease somewhere between the two extremes—one that a property buyer would consider neither "advantageous" nor "disadvantageous." This might be a lease that is set to expire almost immediately after closing. Or perhaps it's a lease that provides for the very same income the buyer could expect from the property's best alternative use. In theory, there are leases like these that would neither increase nor decrease market value as compared to an identical, unleased property. They would have no "independent value." What all of this shows is that any impact on market price is a product of a lease's *attributes*—as one

report in the record puts it, "the quantity, quality and durability of the income stream." The mere *fact* that a property is leased is not a "factor[] which distort[s] market value." Iowa Code § 441.21(1)(b)(1).

Kenney's approach addressed the price-distorting features of his comparators' leases in two ways. First, Kenney considered whether an "ownership interest" adjustment was necessary to account for the lease rate "within the comp's market." He then considered whether an "economic characteristics" adjustment was necessary to account for differences between "the hypothetical market rent of the subject property and the actual rent of the comp." For roughly half of the comparable sales, these two adjustments yielded a net reduction in price. For the others, Kenney adjusted upward.

Walmart was free to challenge the adequacy of these adjustments based on the facts of each sale. And it did so on cross-examination, questioning Kenney at length about the reliability of his information and whether he had accounted for all relevant lease terms. But the present question is not whether Kenney's adjustments were accurate. It is whether they were categorically flawed because they failed to eliminate "the existence of the lease." We conclude they were not. Assuming Kenney did, in fact, adequately account for the advantageous and disadvantageous attributes of these leases, there was nothing left to adjust. The price-distorting factors had been neutralized.

Arguing from another angle, Walmart points out that these "hypothetical market rent" adjustments mean Kenney valued Walmart's owner-occupied stores "as if they were leased." It contends this assumption conflicts with a longstanding rule that "the proper measure of value is what the property would bring if sold in fee simple free and clear of any leases."

14

*I.C.M. Realty v. Woodward*, 433 N.W.2d 760, 762 (Iowa Ct. App. 1988). It is true that Kenney's appraisals treated Walmart's properties as though they were subject to value-neutral leases. But Walmart takes our court's words out of context in arguing this is improper.

In *I.C.M. Realty*, a property owner challenged the assessment of its multi-tenant shopping center, which was encumbered by long-term leases "well below" the going rate. 433 N.W.2d at 761. The owner argued the assessor was required to consider this fact in determining market value. *Id.* at 762. But we rejected that theory, explaining the property must be assessed "independent of" the existing leases. *Id.* (cleaned up). In other words, *I.C.M. Realty* held that a self-imposed, value-reducing encumbrance could be disregarded for purposes of valuation. *Accord Soifer*, 759 N.W.2d at 789 ("[O]ur cases do not support a reduction in market value based on a property owner's self-imposed restrictions."); *Merle Hay Mall*, 564 N.W.2d at 422–23 (finding that an assessor "properly used the objective rental income value" in appraising a mall despite the unfavorable terms of its key tenant's lease). The facts are different here. Kenney's approach treated Walmart's properties as though they were subject to value-neutral, hypothetical leases. We see nothing wrong with that assumption.

Remember, market value is a legal fiction. Walmart has no intention of selling its stores. But to determine their taxable value, the assessor must envision a hypothetical sale. Iowa Code § 441.21(1)(b)(1). And doing so requires some counterfactual assumptions. One is the "existence of a hypothetical buyer at [the property's] current use." *Wellmark*, 875 N.W.2d at 683. Another is the transfer of the property as a "going concern." *Soifer*, 759 N.W.2d at 788; *Riso v. Pottawattamie Bd. of Rev.*, 362 N.W.2d 513, 517 (Iowa 1985). Because Walmart's properties are used for big-box retail, the

assessor was entitled to consider the price they would bring if sold for big-box retail use. This presumes a buyer who would either (1) occupy the properties for big-box retail or (2) lease them to such a retailer. Real-world data is lacking for the former scenario. Kenney's comparators involved the latter.

The fact that Walmart's properties are currently owner-occupied does not mean the assessor must assume they would be vacated in a hypothetical market-value sale. After all, there would be nothing to stop Walmart from conditioning such a sale on its continued occupancy. Whether Walmart would entertain this kind of transaction in reality is beside the point. Our statute permits the assessor to presume a sale free of self-imposed restrictions in order to capture a property's value as a going concern. *See Soifer,* 759 N.W.2d at 789 (finding a McDonald's restaurant was properly valued under the presumption of a franchise-to-franchise sale, "notwithstanding limitations McDonald's may choose to impose" in a real-life transaction).

In sum, we reject Walmart's categorical objection to Kenney's sales-comparison approach. His method complied with section 441.21 by adjusting the price of his comparable sales to the extent they were distorted by advantageous or disadvantageous lease terms. After accounting for these factors and for the market rate in Ames, Kenney was left with comparators that could be used to predict the value of Walmart's properties if sold as going concerns. As a matter of methodology, we find no merit to Walmart's claim that Kenney was required to remove the "independent value" of the leases.

**G. Kenney's Credibility**

Walmart also challenges Kenney's valuations on their facts, alleging his calculations suffer from various "errors, omissions, and inconsistencies." Specifically, Walmart asserts that Kenney (1) failed to sufficiently adjust for "the superior retail location" of his comparable sales; (2) made unreliable and inconsistent adjustments when accounting for market rates in his comparators' locales; (3) premised his "market conditions" adjustments on a faulty understanding of big-box retail trends; and (4) applied "illusory" age and condition adjustments to pump up the value of Walmart's properties. These arguments generally track the points raised in Walmart's exhaustive cross-examination of Kenney, which spans more than one-hundred-fifty pages of trial transcript.

Assessment disputes "often hinge on a factfinder's judgment about conflicting expert witness testimony." *Nationwide*, 983 N.W.2d at 38. This is because "appraisal is not an exact science" but an inherently subjective "exercise of professional judgment." *Sears, Roebuck & Co. v. Sieren*, 484 N.W.2d 616, 617 (Iowa Ct. App. 1992); *accord Wellmark*, 875 N.W.2d at 672. We have long recognized that "the trial court is in a much better position to weigh the credibility" of the witnesses responsible for applying and defending that judgment. *Excel Corp. v. Pottawattamie Cnty. Bd. of Rev.*, 492 N.W.2d 225, 229 (Iowa Ct. App. 1992). And so, even on de novo review, we are reluctant to second-guess the district court's decision to credit the opinions of one appraiser over another. *See, e.g.*, *Marshall Cnty.*, 2026 WL 886741, at *3; *Dallas Cnty.*, 2023 WL 2670039, at *6; *La Posada Grp. LLC v. Pottawattamie Cnty. Bd. of Rev.*, No. 21-0320, 2021 WL 5913614, at *10 (Iowa Ct. App. Dec. 15, 2021); *Payton Apartments, Ltd. v. Bd. of Rev. of Des Moines*, 358 N.W.2d 325, 329 (Iowa Ct. App. 1984).

Many of Walmart's arguments go to the subjective aspects of Kenney's appraisal. Others attack the accuracy of his factual assumptions without the support of rebutting evidence. Credibility is the question on both fronts. And faced with the competing testimony of Walmart's experts—whose own assumptions and inconsistencies were exposed on cross-examination—the district court found Kenney "more convincing." We decline to disturb that determination. "The district court had a front row seat to the battle of the experts in this case." *Marshall Cnty.*, 2026 WL 886741, at *3. It observed the experts' demeanor, heard the tenor of their answers, and benefited from demonstrative evidence that is not a part of our appellate record. Walmart's adjustment-specific challenges fail to shake our confidence in the court's bottom-line credibility assessment. Upon our de novo review, we find Kenney's valuations reliable.[7]

## IV.   Conclusion

For these reasons, we reject Walmart's legal and factual challenges to Kenney's valuation and find the Board satisfied its burden of proof to uphold the assessments at issue. We therefore affirm the district court's order denying relief.

**AFFIRMED.**

---

[7] In addition to his sales comparison, Kenney also appraised Walmart's properties using income-capitalization and cost-depreciation approaches. These alternative analyses produced similar results. While sales comparison is the statutory preference, this three-pronged valuation—which Walmart expert Jenkins did not perform—lends credence to Kenney's valuation. *See Heritage Cablevision v. Bd. of Rev. of Mason City*, 457 N.W.2d 594, 598 (Iowa 1990) ("The advantage of using multiple appraisal techniques lies primarily in those instances where the differing techniques lead to similar conclusions concerning market value and therefore tend to support each other.").