**RUAN CENTER CORPORATION,**
Appellee,

v.

**BOARD OF REVIEW OF the CITY OF DES MOINES, Iowa, Appellant.**

No. 62621.

Supreme Court of Iowa.

Oct. 15, 1980.

Rehearing Denied Nov. 6, 1980.

Allan A. Herrick of Herrick, Langdon & Langdon, and Jeffrey E. Lamson of Belin, Harris, Helmick & Lovrien, Des Moines, for appellant.

John A. McClintock and Ronald A. Riley of Hansen, McClintock & Riley, Des Moines, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, McCORMICK, McGIVERIN and SCHULTZ, JJ.

McGIVERIN, Justice.

This appeal involves the 1976 assessed valuation of real estate owned by the Ruan Center Corporation (Ruan). The property consists of the thirty–six story Ruan Center and the old Bankers Trust buildings in Des Moines. The assessor valued the property at $24,004,790 as of January 1, 1976. Ruan filed a protest with the Board of Review of the City of Des Moines (Board). The Board reduced the assessment to $22,261,260. Ruan appealed to the district court, which reduced the assessment to $19,700,000. The Board appealed and Ruan cross–appealed. We reverse on the appeal, affirm on the cross–appeal and reinstate the valuation fixed by the Board.

We must address the following questions in our review of the case:

(1) Did Ruan offer competent evidence by at least two disinterested witnesses that the value of its property is less than that assessed so that the burden of proof shifted to the Board under section 441.-21(1), The Code 1975, to uphold the assessed valuation?

(2) Did the trial court err in refusing to include the value of improvements to the building made by tenants?

(3) After the burden of proof shifted to the Board, did it carry its burden of upholding the assessed valuation?

The land involved is an L–shaped tract in downtown Des Moines. It consists of approximately three–fourths of a square block bordered by Grand Avenue on the north and Locust Street on the south. Sixth Street is the boundary on the east with Seventh Street to the west. The land in the northeast quadrant of the block is not part of the real estate whose value is to be determined here. The western half of the block is occupied by the thirty–six story Ruan Center. Its rusting exterior is a landmark in the central business district and is referred to as the "Rusty Bucket" by some Des Moines citizens. The southeast quadrant used to be occupied by the old Bankers Trust buildings. Since this assessment, they have been demolished.

In 1976 the Des Moines assessor valued this property at $24,004,790 as of January 1, 1976. Ruan protested this figure before the Board under section 441.37, The Code 1975. After an informal hearing, the Board reduced the valuation to $22,261,260. The reduction was based on the Board's decision that the old Bankers Trust buildings were worth $100,000 rather than the $1,843,530 set by the assessor.

Ruan appealed the Board's decision to the district court under section 441.38. After trial, the district court decided that the value of the property was $19,700,000. The Board appeals to us claiming the valuation should not have been reduced. Ruan cross–appeals claiming that the property is worth even less than the trial court determined.

I. *Burden of proof.* Section 441.21(1), The Code 1975, provides that "in protest or appeal proceedings when the complainant offers competent evidence by at least two disinterested witnesses that the market value of the property is less than the market value determined by the assessor, the burden of proof thereafter shall be upon the officials or persons seeking to uphold such valuation to be assessed." The Board argues that Ruan did not present competent evidence that the Board's valuation was excessive and therefore the burden is not on them to uphold the valuation. Rather, the Board argues that the burden is on Ruan to show that the valuation was excessive. We conclude that the burden shifted to the Board to uphold the assessed valuation.

Section 441.21(1) directs the assessor to determine value by considering sale prices of the property in question or other comparable property. Where, as in this case, the sale prices approach does not readily establish a market value because there have been no comparable sales, the assessor must use the "other factors" approach. § 441.21(1). The other factors approach arrives at market value by considering earning capacity, industrial conditions, cost, depreciation, replacement cost and "all other factors which would assist in determining the fair and reasonable market value." *Id.; Equitable Life Insurance Co. v. Board of Review*, 281 N.W.2d 821, 823 (Iowa 1979). Section 441.-21(1) prohibits the assessor from using just one factor in the other factors approach.

The Board's argument that the burden did not shift to them rests on their claim that the testimony of the two witnesses for Ruan, Arthur J. Frahm and Reaves C. Lukens, was not competent evidence as required by section 441.21(1). The reason their testimony was incompetent, according to the Board, is that these witnesses, while testifying that they used more than one approach to valuation, only used one factor. According to the Board, this is prohibited by section 441.21(1).

■ We conclude that Frahm and Lukens' testimony was competent because both witnesses used more than one of the other factors in arriving at their valuations. Lukens used the income method and the market data method. The Board argues that Lukens did not use the market data method because he testified that he relied primarily on the income method and used the other method "primarily as a check on the results of the income approach." While Lukens' testimony might reduce the weight a court should give to his valuation under the market data method, we cannot conclude that it must be ignored. Lukens' testimony was competent because he used more than one factor in determining value. *Equitable*, 281 N.W.2d at 825.

■ Frahm testified that he used the income method and the cost method in arriving at his valuation. The Board argues that we should ignore his valuation under the cost method because the result is no different than his valuation under the income method. The way Frahm uses his cost method results in a valuation that is identical to his valuation under his income method. This is because under the cost approach, Frahm deducts an amount of functional obsolescence that results where the cost to replace the building is not justified in view of the income it generates. No matter how much the replacement cost is, the value under his cost method will be the same as the result under the income method because both methods assume that a building's market value is tied to the income it will produce.

■ While the way Frahm computes his cost method is tied to his results under the income method, not all appraisers use the cost method as Frahm does. While a court might put less weight on Frahm's cost method, we cannot say that he did not try to compute a value under his version of the cost approach. We hold that Ruan produced two disinterested witnesses who offered competent evidence that the market value was lower than the value set by the Board, and therefore the burden of proof shifted to the Board to uphold its valuation.

II. *Valuation of improvements by tenants.* The Ruan building was finished in

what Ruan calls "building standard" construction. This meant that tenants could use the space by simply moving into it. For example, Ruan furnished the tenants with space that had acoustical tile ceilings, carpet, lighting, ventilation, and doors. The rent is based on the premises being finished at "building standard."

Some tenants under leases from ten to twenty–five years desired space that included improvements not provided by Ruan as part of its building standard construction. For example, Blue Cross–Blue Shield installed a special earthquake-proof floor and additional ventilation for their computer. Other tenants desired plusher space and installed paneling and different carpeting. The bank on the ground floor presumably installed a vault. These improvements, installed at the tenants' expense, did not increase their rent.

In April 1976 the city assessor asked the tenants to report the cost of all leasehold improvements, excluding improvements that were reported as personal property. The responses to this request indicate that as of January 1, 1976, tenants had spent $4,321,318 on improvements to their leaseholds. As of January 1, 1977, they had spent $5,123,919. The record only contains testimony on the general nature of these improvements and their total cost.

■ As a general rule, property that is leased is listed by, and taxed to, the lessor. § 428.1(6), The Code 1975. If a tenant improves the real estate, by either building a new structure or adding on to an existing structure, the tenant can be taxed after listing the property. Id., § 428.4. This statutory scheme puts the burden on the taxpayers, rather than the assessor, to decide who is going to pay taxes on real property that has been improved by someone other than the owner. It relieves the assessor of the burden of investigating whether a tenant or a lessor improved the property. In this case, therefore, the assessor properly assessed taxes on the improvements by tenants to Ruan.

■ Even though Ruan agreed at oral argument that taxes on improvements may be properly assessed against the lessor, it argues that because of the nature of the improvements in this case, Ruan should not be liable for any tax on the tenant-installed improvements. This argument is based on section 441.21(1), which provides that "[s]pecial value or use value of the property to its present owner" shall not be considered in determining market value. In *Maytag Co. v. Partridge*, 210 N.W.2d 584, 591 (Iowa 1973), we stated that special value "comes into play when sentiment, taste, or other factors, frequently subjective, give property peculiar value or use to its owner that it does not have to others." The trial court agreed with Ruan that the tenant improvements should not be included in valuing the building because they only had special value to the particular tenant. The court said that in its judgment, the tenant improvements were "special to the tenant" and resulted from "special needs of the tenant for such overplus." We disagree and conclude that the value of such improvements should be added to the market value of the building.

The record is not very extensive on the exact nature of the improvements. On the limited record, we conclude that these improvements increased the building value and were not just of special value to the particular tenants who installed them.

*Maytag* limited section 441.21(1), and its prohibition against valuing special value or use of property to the owner, to situations where factors, frequently subjective, give value that the property does not have to others. The improvements by tenants to the Ruan building are not such property. The record does not show that improvements to office space, such as carpeting and paneling, were of value only to the particular tenant. Presumably, if the tenants sold their leasehold interest, they could charge for the improvements. Upon expiration of the leases, Ruan could charge higher rent because of the improvements than it could if the property remained at building standard construction. Although some improvements, such as the vault added by the

bank or the area for a computer that Blue–Cross installed, are not of value to every potential tenant, there is no evidence that another bank or company with computers could not use the space. Similarly, in *Maytag* we held that just because Maytag's plant was designed for home appliances did not mean it had value only to Maytag. We said that "another competent home appliance manufacturer could step into Maytag's shoes and operate this plant." *Maytag*, 210 N.W.2d at 591. We conclude that the improvements installed by the tenants should be included in the valuation of the property.

III. *Correctness of the valuation.* Our prior cases have established principles for our review of valuations of property for taxes. *Foreman & Clark, Inc. v. Board of Review*, 286 N.W.2d 169, 171 (Iowa 1979); *Equitable Life Insurance Co. v. Board of Review*, 281 N.W.2d 821, 823 (Iowa 1979). There is no presumption that the assessor's valuation is correct. *Id.* Our review of the district court's decree is de novo. *Id.*

The district court reduced the Board's assessment of $22,261,260 to $19,700,000. The Board contends that its value was correct while Ruan contends that the district court did not reduce the assessment enough. Ruan says the property should be valued at $16,514,869. We conclude that the Board has met its burden of upholding the valuation and therefore reinstate its valuation of $22,261,260.

Each party had two appraisers value the property. Arthur J. Frahm and Reaves C. Lukens appraised the property for Ruan. The Board had Willard A. Stewart and Harry A. Winegar value the property. The results of their work are as follows:

| | Market Data method | Cost method | Income method | Final Value |
|---|---|---|---|---|
| Frahm | not used | $16,850,000 | $16,850,000 | $16,850,000 |
| Lukens | $16,500,000 | not used | $16,500,000 | $16,500,000 |
| Stewart | not used | $25,362,000 | $19,625,000 | $22,500,000 |
| Winegar | not used | $25,000,000 | $21,000,000 | $23,000,000 |

The market value as determined by the appraisers for Ruan differs markedly from that determined by the Board's appraisers. This is largely due to Lukens and Frahm's judgment that the Ruan building cost more to build than is justifiable in view of the income it generates. They also thought that the building did not use energy as efficiently as it should. The Board's appraisers simply disagreed that these types of functional obsolescence–obsolescence due to the internal plan or adequacy of a building–were as great as Ruan's appraisers thought. We find the figures used by the Board's appraisers to be more credible.

The appraisers arrived at different values under the income method partly because of different assumptions about the proper mortgage rate to use in their computations. The higher the mortgage rate, the lower the value of the property under the income method. Winegar thought that the best interest rate on January 1, 1976, was 9 percent. Frahm and Lukens used 10⅛ percent. The trial court, by using a 10 percent mortgage rate, valued the property at $18,500,000 under the income method, which is higher than either Frahm or Lukens determined using that method.

We also conclude that the Board has met its burden of upholding the valuation because neither the trial court nor Frahm added value for tenant improvements. While Ruan argues that Frahm did include the improvements, we conclude otherwise. Frahm testified that improvements "would not necessarily and probably not be usable to anyone else taking over the space." His report stated, "The leasehold rights, by virtue of ... tenant improvements, are not included." In determining the amount of rent that could be charged, he appraised it "at building standard."

Winegar included the value of tenant improvements in his income method. When figuring the value of the building based on the actual amount of income Ruan receives, he added 50 percent of the cost of the improvements because they are of value, but Ruan does not get any increased rent from them. In his income method based on the potential amount of income the building could generate, he added a figure representing a return of 10 percent on 50 percent of the cost of the improvements. Stewart also tried to value the building by including improvements by tenants.

Finally, we note that the Board's valuation is not excessive in light of the fact that on January 1, 1976, while the building was brand new, Ruan and its tenants had invested $25,577,000 in the building. Section 441.21(1) lists cost as one of the factors to be considered in setting market value. Also Ruan then had mortgages totaling $22,800,-000 on the property which was insured for fire and extended coverage for $27,000,000. These factors could also be considered under section 441.21(1).

In view of the foregoing, we conclude that the Board has shown that its valuation of $22,261,260 is not excessive.

Under our view of the case, it is unnecessary to consider other issues raised by the parties.

The case is reversed on the Board's appeal and affirmed on Ruan's cross-appeal.

REVERSED ON THE APPEAL; AFFIRMED ON THE CROSS-APPEAL.