HERITAGE CABLEVISION d/b/a North Iowa Cablevision Association, Ltd., Partnership, Appellee,

v.

BOARD OF REVIEW OF the CITY OF MASON CITY, Iowa, and Nick Bobgin, Chairman of the Board of Review of the City of Mason City, Iowa, and a Member Thereof, Appellants.

HERITAGE CABLEVISION d/b/a North Iowa Cablevision Association, Ltd., Partnership, Appellee,

v.

BOARD OF REVIEW OF the COUNTY OF CERRO GORDO, Iowa, and Edwin Krause, Chairman of the Board of Review of the County of Cerro Gordo, Iowa, and a Member Thereof, Appellants.

No. 88–1546.

Supreme Court of Iowa.

June 20, 1990.

Herman P. Folkers, City Atty., and Michael J. Houchins, Asst. County Atty., for appellants.

Mark R. Schuling of Brick, Seckington, Bowers, Swartz & Gentry, P.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and NEUMAN, JJ.

CARTER, Justice.

This dispute involves the assessment of those assets of the plaintiff, Heritage Cablevision, located in Cerro Gordo County which are taxable as real property. Plaintiff is the owner of a cable television sys-

tem which provides service to the cities of Mason City, Clear Lake, and Ventura.

In the plaintiff's appeal of the assessment pursuant to Iowa Code section 441.38 (1989), the district court reduced the aggregate assessment as confirmed by the boards of review from $3,168,519 to $1,611,449. The boards of review of the City of Mason City and Cerro Gordo County appealed the district court's order. The court of appeals reinstated the assessed valuation which had been confirmed by the boards of review. We granted further review of the court of appeals decision. Upon our consideration of the valuation evidence de novo, we vacate the decision of the court of appeals and reinstate the valuations established by the district court.

■ The assessment of plaintiff's property by both Cerro Gordo County and the City of Mason City was undertaken by Vanguard Appraisals, Inc., under contract with the respective city and county assessors offices. Vanguard's appraiser was Robert Kocer. His aggregate valuation for plaintiff's assets taxable as real property in Cerro Gordo County was $3,168,519 of which $3,057,070 represented assets whose value was in dispute. Kocer arrived at his valuation of the disputed assets by using a three-component valuation analysis involving capitalized income, replacement cost, and comparable sales data weighted twenty percent, thirty percent, and fifty percent, respectively. The comparable sales component independently produced a value of $3,282,671.

The parties have stipulated that for purposes of the assessment appeal process the city and county assessments may be considered as a whole with the court establishing an aggregate valuation of all of plaintiff's taxable assets within Cerro Gordo County as of January 1, 1987. The parties have agreed to allocate the aggregate valuation established by the court among the respective taxable values for Mason City, Clear Lake, and Ventura. The value of plaintiff's buildings, land, and concrete has been stipulated throughout the assessment appeal to be $111,449. The assets for which the valuations were not stipulated

and which comprise the major share of the asset value consist of metal or fiberglass dish mechanisms, steel tower structures used to hold transmission-receiving antennae, transmission cables, modulators, processors, and descrambler units located throughout the county.

Robert Kocer testified for the boards of review at the trial. Plaintiff offered the testimony of two expert witnesses, James Bond, Jr., and Don Turlington. Kocer, applied a combination of capitalized income, replacement cost, and comparable sales appraisal techniques. He weighted the capitalized income valuation at thirty percent, the replacement cost valuation at ten percent, and the market or comparable sales data at sixty percent. Under this weighted formula, the market valuation component which had been $3,282,343 in his original appraisal was adjusted upward to $10,000,000. Kocer's replacement cost component was $3,248,000, and his capitalized income component was $8,592,000.

Kocer's upward adjustment of the comparable sales valuation by more than five million dollars was primarily attributable to allegedly more meaningful comparable sales data which the witness claimed to have uncovered between the time of the original appraisal and the trial of the section 441.38 appeal. Plaintiff's witness, James Bond, Jr., relying primarily on a replacement cost appraisal analysis, fixed the disputed asset value at $1,110,693. Turlington, who also favored a replacement cost methodology, appraised the assets whose value was disputed at $756,150.

The district court, after discussing the various appraisal theories which had been advanced by the experts, concluded that the market value of plaintiff's assets other than the land, buildings, and concrete was $1,500,000. This figure approximated the replacement cost component of Kocer's valuation testimony at trial less an amount which Kocer had attributed to lease values for utility poles owned by third parties.

The district court specifically rejected the validity of the market data or comparable sales component of Kocer's valuation testimony based on the court's finding that the

price which was paid in the so-called comparable sales more nearly reflected the value of the cable television system as a business enterprise than the value of the taxable assets. The district court also suggested reasons why the income valuation component of Kocer's valuation testimony was flawed.

The court of appeals' primary motivation in overturning the district court's valuation findings and reinstating the original assessment[1] was that court's conclusion that the sales price approach is preferred as the primary valuation method in establishing the assessed value of taxable real estate under Iowa Code section 441.21(1)(b) (1989).

■ Our cases interpreting section 441.21 indicate that the market data or comparable sales approach is to be utilized in determining market value of property assessed under that section unless market value "cannot be readily established in that manner." *See Cablevision Assocs. VI v. Board of Review,* 424 N.W.2d 212, 214 (Iowa 1988); *Ross v. Board of Review,* 417 N.W.2d 462, 465 (Iowa 1988); *Equitable Life Ins. Co. v. Board of Review,* 281 N.W.2d 821, 823 (Iowa 1979); *Bartlett & Co. Grain v. Board of Review,* 253 N.W.2d 86, 87 (Iowa 1977). An appealing property owner is not required, however, to accept as a verity the assessor's determination that adequate evidence of comparable sales is available. The property owner may seek to establish, either by challenging the assessor's proof or by independent evidence, that market value cannot be accurately established through comparable sales and then attempt to establish market value through the so-called "other factors" approach. *See Equitable Life,* 281 N.W.2d at 823; *Maytag Co. v. Partridge,* 210 N.W.2d 584, 587 (Iowa 1973). The fact that one litigant calls witnesses who purport to testify as to comparable sales does not in itself establish that market value can readily be determined in that manner. That determination requires a qualitative evaluation rather than a quantitative evaluation.

■ The statutory preference for evaluations based on comparable sales applies only to those situations where the value may be readily established by that method alone. In instances where the value cannot be established solely by comparable sales, there is nothing in the statute which requires comparable sales data to be weighted more heavily in the "other factors" approach than other relevant data. The assessors or boards of review in the present case have never claimed that the disputed valuations may be readily established by comparable sales alone. They have utilized the "other factors" approach throughout in attempting to show the market value of plaintiff's property.

■ There appears to be some confusion in our decisions concerning whether, under the "other factors" approach, the statutory language "actual value shall not be determined by use of only one such factor" refers to use of more than one appraisal technique, *i.e.,* market data, cost method, or income method; or use of more than one of the factors which are listed in section 441.21, *i.e.,* "productive and earning capacity, industrial conditions, costs, physical and functional depreciation, obsolescence, and replacement cost." Our decision in *Equitable Life Insurance* suggests this language has reference to using more than one appraisal technique. 281 N.W.2d at 825. In contrast, our decisions in *Office of Pottawattamie County Assessor v. Iowa Department of Revenue,* 417 N.W.2d 214, 218 (Iowa 1987), and *Ruan Center Corp. v. Board of Review,* 297 N.W.2d 538, 540 (Iowa 1980), suggest that the reference is to more than one of the factors listed in the Code.

■ Whichever of these meanings is attributed to the words "other factors," we are convinced that a court, in considering

---

1. The discussion of Kocer's comparable sales valuation in the court of appeals decision suggests that the court credited his trial testimony. That testimony supported a valuation of $9,000,-000. The court's reinstatement of the $3,168,-519 assessment approved by the boards of review was doubtless due to the fact that the assessors had not appealed, and, consequently, the valuation could not be increased in an appeal taken by the property owner. *See Markwardt v. County Bd. of Review,* 174 N.W.2d 396, 401–02 (Iowa 1970).

an assessment appeal under section 441.39, is free to give no weight to proffered evidence of comparable sales which it finds not to be reflective of market value. An appealing party's attack on an assessment confirmed by the board of review is a two-stage process. In the first stage, the party challenging the assessment is required to show that the board of review's valuation is excessive, inadequate, inequitable, or capricious. *Richards v. Hardin County Bd. of Review*, 393 N.W.2d 148, 151 (Iowa 1986); *Wunschel v. Board of Review*, 217 N.W.2d 576, 578 (Iowa 1974). In the second stage, that party must establish what the correct valuation should be. A party whose litigating theory in stage one is based on showing that one appraisal technique is singularly better suited than other appraisal techniques in arriving at market value need not in stage two proffer evidence of value under those theories which it brands as unreliable.

■ The advantage of using multiple appraisal techniques lies primarily in those instances where the differing techniques lead to similar conclusions concerning market value and therefore tend to support each other. When the varying techniques produce divergent valuations, it does not necessarily follow that market value is accurately divined by averaging the divergent results or in applying the divergent results under arbitrarily weighted formulas.[2] A trier of fact deciding an appeal under section 441.39 may be better served in such situations by accepting that evidence which it finds to be most reliable and rejecting that which is determined to be unreliable.

■ In commenting on valuation techniques for stock of closely held corporations in dissenting shareholders' valuation cases, we have observed:

> Courts, unlike appraisers, are forced to decide cases based upon the evidence presented. Parties to "fair value" cases

in the courts may be unable to find witnesses whose testimony will correspond to each of the recognized elements of fair value. *Moreover, testimony as to a particular element may appear to the court to be so unreliable that it has no place in influencing the final result.* *Richardson v. Palmer Broadcasting Co.*, 353 N.W.2d 374, 378 (Iowa 1984) (emphasis added) (citation omitted). We believe that similar considerations prevail in the trial of assessment appeals under section 441.39.

The evidence of comparable sales used by Kocer which the district court rejected as not representative of the value of plaintiff's property consisted of six sales of cable television systems in Iowa. Of the six sales, two took place in 1985, three took place in 1986, and one took place in 1987. In rejecting this testimony as unrepresentative taxable value, the district court stated:

> [W]hile the market approach method utilized by Kocer may have validity if he were attempting to determine the market value of the *system*, it does not follow that the method accurately determines the value of *taxable assets*. That is, the court concludes that the total fair market value of the system necessarily includes nontaxable assets such as a franchise to operate, an established customer base, experienced personnel in place, goodwill, and other intangibles.

We believe the district court's conclusion concerning these comparable sales was valid. The evidence suggests that a cable television system, as a going business enterprise, can generate tremendous income for the owners. We believe that the valuations which Kocer derived from these sales failed to exclude the substantial value which the buyers were receiving from the business enterprise with which the taxable assets were associated. Kocer attempted to determine that portion of the total price paid for other cable television systems as going concerns which was attributable to

**2.** We are unable to find any explanation in the record concerning why Kocer believed that his market data approach should be weighted at 60% in his valuation and the income and cost factors weighted at 30% and 10%, respectively. Absent such an explanation, a weighted application of the various results produced by different appraisal methods is meaningless to a reviewing court.

the taxable assets. He did so by taking the franchise fee payable to the governmental body, capitalizing that sum and subtracting the latter figure from the total sale price. We do not believe this adjustment produced a figure which is in any way representative of the fair and reasonable exchange between a willing buyer and willing seller of only the taxable assets.

The boards of review contend that Kocer's use of the challenged comparable sales data was justified based upon the "going concern" valuation of assets approved by this court in *Maytag Co.*, 210 N.W.2d at 590–91. The application of the "going concern" principle in *Maytag Co.* was in the context of rejecting the property owner's claim that its machinery should be valued exclusively by a market data analysis of the used machinery market. We approved the assessor's depreciated cost appraisal in that case under the "other factors" approach. We did not suggest in *Maytag Co.* that in trying to value taxable assets under a comparable sales analysis the statutory directives against considering "special value or use value of the property to its present owner, and the goodwill or value of a business which uses the property as distinguished from the value of the property as property" may be disregarded.

In considering the tensions presented between Kocer's "going concern" valuations and the present statutory command that goodwill, value of the business, and special value to the owner cannot be considered, we find that the district court properly rejected Kocer's market data valuations. We also conclude that the district court acted correctly in giving slight if any weight to that witness's income approach to valuation. If Kocer's capitalized value of all assets under his income approach is reduced by the value of the taxable assets established under his cost less depreciation approach, this suggests that a substantially greater share of the gross income which was utilized in his income calculations was produced by nontaxable assets.

■■■ After rejecting the market data and income components of Kocer's valuation, the district court was left with his

valuation based on depreciated cost. Kocer's appraisal based on depreciated cost appears to be a reasonably accurate measure of market value except for his inclusion of a fictional leasehold value for utility poles owned by third parties. There was no evidence that such leaseholds existed. Moreover, under our assessment procedure, property subject to a lease is taxed as a whole and measured by the value of the fee. *Lucas v. Purdy*, 142 Iowa 359, 365, 120 N.W. 1063, 1064–65 (1909); *Oberstein v. Adair County Bd. of Review*, 318 N.W.2d 817, 819–20 (Iowa App.1982). Taxation of the whole is administratively assessed against the owner of the fee and covers the value of the leasehold interest as well as the reversionary interest. The lessor's remedy must lie in appropriate provisions in the lease requiring lessee contribution to the total tax bill. *Oberstein*, 318 N.W.2d at 821.

The district court's valuation was consistent with Kocer's depreciated cost valuation less the amount attributable to the fictitious leases. This valuation is considerably more than that which was reflected in the testimony of the plaintiff's experts. We conclude that the district court's valuation correctly reflects the market value to be accorded the disputed assets.

■■■ We affirm the district court's judgment. That court should, however, after receipt of the procedendo from this court, establish a procedure for settling by supplemental decree the allocation of aggregate values among the various taxing entities in Cerro Gordo County. Such a decree is required by section 441.39 in order for the auditor to accurately reflect the change in assessed values. *See Sevde v. Board of Review*, 434 N.W.2d 878, 881 (Iowa 1989).

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.