# IN THE COURT OF APPEALS OF IOWA

No. 21-0320
Filed December 15, 2021

**LA POSADA GROUP LLC,**
     Plaintiff-Appellant,

**vs.**

**POTTAWATTAMIE COUNTY BOARD OF REVIEW,**
     Defendant-Appellee.
_____

     Appeal from the Iowa District Court for Pottawattamie County, Jeffrey L. Larson, Judge.

     La Posada Group LLC appeals the district court order affirming the Pottawattamie County Board of Review's tax assessment of commercial real estate. **AFFIRMED.**

     Angie J. Schneiderman and Coyreen R. Weidner of Moore, Corbett, Heffernan, Moeller & Meis, L.L.P., Sioux City, for appellant.

     Leanne A. Gifford, Assistant Pottawattamie County Attorney, Council Bluffs, for appellee.

     Heard by Mullins, P.J., and Schumacher and Ahlers, JJ.

**MULLINS, Presiding Judge.**

La Posada Group LLC (La Posada) appeals the district court order affirming the Pottawattamie County Board of Review's (Board) tax assessment of commercial real estate. La Posada argues the district court erred in determining it could not consider valuation evidence outside the sales-comparison approach to value and ultimately affirming the assessment.

## I. Background

This case involves the determination of the market value of a hotel owned by La Posada and located in Pottawattamie County as of January 1, 2019. The property is a 3.67-acre parcel improved by a 151-room, limited-service, upscale suite hotel. The hotel was built in 2006, and it boasts a small bar, guest laundry facilities, a business center, swimming pool, and fitness room. Each of the rooms contains either one king bed or two double beds, and some of the king-bed rooms have Jacuzzis. The hotel was sold to La Posada in October 2018 for an undisclosed price as part of a six-hotel portfolio. During the listing period, the sales broker received two other individual offers in the amounts of $5,250,000 and $6,000,000. The declaration of value following sale to La Posada listed the purchase price as $6,500,000—which the listing broker ultimately concurred with—with $5,600,000 attributable to real estate and the remainder to untaxable personal property. A competing hotel opened across the street around the time La Posada purchased the property.

The county assessor assigned the property a real market value of $9,595,700. La Posada appealed the assessment to the Board, asserting the proper value was $6,500,000. The Board affirmed the assessment, finding La

Posada failed to present sufficient evidence to supports its desired assessment. La Posada appealed to the district court for a trial de novo. In its pretrial brief, La Posada advised its experts' report placed a value of $6,050,000 on the property and the real property and associated personal property were purchased in October 2018, with $5,600,000 being attributable to the real property.

At trial, the parties' experts testified. La Posada's expert was Brock Heyde, a commercial real estate appraiser who is state certified in several states.[1] He began residential appraisals in 2004 and started doing commercial appraisals in 2012. He has specialized in hotels since 2015. In completing the appraisal, Heyde inspected the property, spoke with the owner, did research, interviewed the listing broker, interviewed other brokers and appraisers to verify other transactions, analyzed data and records, and authored a report. Heyde explained hotel appraisals are complex because they involve real property, business components, furniture, fixtures, and equipment, and they usually sell as a going concern.

Heyde utilized three approaches for value: sales comparison, gross revenue multiplier, and income capitalization.[2] Under the sales-comparison method, Heyde reviewed sales of similar hotels and their per-unit basis, making adjustments for location and condition of the property. The gross revenue multiplier is a variation of the sales comparison approach and "is calculated by taking the sales price of a sale and dividing it by gross revenues," which produces

---

[1] At the time he worked on the appraisal, he was not certified in Iowa, but another appraiser who worked with Heyde on the appraisal, Bernie Shaner, was. Shaner has since retired.

[2] A cost approach is also a common method, but Heyde testified it is not reliable for hotels that are several years old given depreciation.

a gross revenue multiplier across multiple sales, and then the product of the multiplier and projected revenue is the market value estimate. Heyde testified this method is less useful for appraising upscale hotels as compared to lower-priced, economy hotels, but he uses the method to compare it to the result under the income-capitalization approach. The income-capitalization approach "essentially converts a future anticipated income stream into a present market value."

> Heyde's report explained the sales-comparison approach as follows:
>
> The sales comparison approach develops an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject, focusing on the difference between the subject and the comparables using all appropriate elements of comparison. This approach is based on principles of supply and demand, balance, externalities, and substitution, or the premise that a buyer would pay no more for a specific property that the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership.
> The process of developing the sales comparison approach consists of the following: (1) researching and verifying transactional data, (2) selecting relevant units of comparison, (3) analyzing and adjusting the comparable sales for differences in various elements of comparison, and (4) reconciling the adjusted sales into a value indication for the subject.

The report also explained the primary unit of comparison used was price per room. For this approach, Heyde compared four sales across the Midwest, and his findings are detailed in the following table:

| Sale Date | Year Built | Rooms | Sales Price[3] | Unadjusted Room Price |
|---|---|---|---|---|
| June 2017 | 1999 | 86 | $6,000,000 | $69,767 |
| April 2019 | 2010 | 60 | $3,600,000 | $60,000 |
| May 2017 | 1999 | 82 | $5,675,000 | $69,207 |
| March 2017 | 1998 | 79 | $3,185,566 | $40,324 |

---

[3] These numbers figure in the sale price plus the amount of improvements the franchisor or flag hotel will require the new owner to make in improvements. As Heyde explained it, both amounts reflect what a willing buyer is willing to pay for the property.

Then adjusting the room prices for increases in value and differences in location, condition, chain scale, size, and amenities, Heyde reached respective adjusted room prices of $64,701, $56,669, $51,090, and $48,046. Based on these figures and considering the subject hotel's needs for renovation and the new nearby competition, Heyde landed on a figure near the lower end of the adjusted range, $50,000 per room, or $7,550,000 in total. He then reduced that figure by $370,000 La Posada would be required to make in improvements under its franchise agreement, to reach $7,180,000 under the sales-comparison approach.

Turning to the gross revenue multiplier, the report explained that figure is "derived by dividing the sale price by the stabilized gross revenue." Four comparable hotels in the Midwest that had available gross incomes were considered:

| Sale Date | Year Built | Rooms | Adjusted Sale Price | OER[4] | Stabilized GRM |
|---|---|---|---|---|---|
| June 2017 | 2004 | 128 | $8,100,000 | 80.7% | 3.13 |
| April 2019 | 2010 | 60 | $3,800,000 | 69.0% | 2.98 |
| May 2017 | 1999 | 82 | $5,675,000 | 71.0% | 3.44 |
| March 2017 | 1998 | 79 | $3,185,566 | 70.0% | 2.20 |

Taking into consideration the subject property's renovational needs, other risk factors, projected gross income of $3,106,684, and operational expenses (not including real estate taxes), Heyde projected an OER between 72% and 77%, with a stabilized GRM somewhere near 2.25, which would result in a value indication of $6,990,000.[5] Again accounting for $370,000 in improvements under the franchise agreement, the GRM valuation was calculated to be $6,620,000.

---

[4] Operating expense ratio.
[5] The product of gross revenue of $3,106,684 and GRM of 2.25.

As to the income-capitalization approach, that valuation is developed by converting anticipated future income into an indication of present value by a capitalization process. There are two types of capitalization: direct capitalization and yield capitalization, more commonly known as discounted cash flow (DCF) analysis. The following steps are used to reach a valuation under this approach: (1) estimate occupancy and average daily rate (ADR), (2) calculate revenue per available room (RevPAR), (3) estimate anticipated operating expenses, and (4) select and apply appropriate capitalization techniques. The potential gross income is a function of the stabilized occupancy multiplied by the ADR to calculate the RevPAR.

Heyde used historical data from Smith Travel Research (STR) to analyze the subject hotel and six competing hotels in Council Bluffs with similar age, condition, and price point. Based on historical data, Heyde predicted the competitive set, for 2019, to have occupancy of 72%, with an ADR of $97, resulting in a RevPAR of $69.84.[6]

Based on historical data for the same years, Heyde predicted the subject hotel would have occupancy of 58%, with an ADR of $95, resulting in a RevPAR of $55.10. These figures result in room revenue of $3,036,837,[7] or $20,112 per room. Heyde also analyzed the subject hotel's food and beverage revenue, as well as "other operating departments revenue." While his report and testimony are somewhat unclear on the totals, we assume they were $18,221 for food and

---

[6] No value predictions were provided, assumingly because the comparison hotels have different numbers of rooms.

[7] The product of $95 ADR, 151 rooms, 58% occupancy, and 365 days.

beverage and $51,626 for other departments.[8]  So Heyde reached a total estimated revenue of $3,106,684.[9]

As to expenses, Heyde began with room expenses, which covers various items.  Based on averages of actual room expenses of five comparable Midwest hotels in recent years; four categories of limited service hotels; and the subject hotel's actual expenses for 2016 through 2018; Heyde reached a rooms revenue ratio of 26.3% or $7275 per room, and in turn estimated expenses would amount to 27% of rooms revenue, or $5430 per room for the subject hotel.[10]  As to food and beverage expenses, the average of expenses for food and beverage between one year of another Midwest hotel and the previous three years of the subject hotel was 72.4% of revenue, but Heyde projected the expense for the subject hotel would be 70% or $84 per room for 2019.[11]  As to other operating departments, the average among one other hotel's 2018 actual expenses, four limited services categories, and the previous three years of the subject hotel was 56.2% or $256 per room.  Based on the range of the indicators considered, Heyde predicted the

---

[8] Heyde predicted total revenue for 2019 to be $3,106,684.  He predicted food and beverage revenue to be 0.6% of room revenue ($3,036,837 X .006 = $18,221.02), and other revenue to be 1.7% of room revenue ($3,036,837 X .017 = $51,626.23). We note the figures he lists for per available rooms does not align with these totals. In any event, adding $18,221 in food and beverage revenue and $51,626 in other revenue results in a sum of $69,847.  Subtracting room revenue of $3,036,837 from the report's finding of total revenue of $3,106,684 also results in a figure of $69,847.

[9] This is the same gross revenue used under the GRM method.

[10] None of the equations discussed below were provided in the report.  This would be the product of room revenue of $3,036,837 and 0.27 ($819,946), divided by 151 rooms, equaling $5430, rounded down.

[11] The product of food and beverage revenue of $18,221 and 0.7 ($12,754.70), divided by 151 rooms, equaling $84, rounded down.

subject hotel's 2019 ratio to be 65% or $222 per room,[12] although that prediction was higher than the subject hotel's previous three years.

Next, Heyde considered undistributed operating expenses, which included general expenses not tied to any particular department. The first in this category was general and administrative expenses. Averaging five Midwest comparables, four limited service categories, and actual expenses for the subject hotel over the last three years, he reached 8.1% or $2360 per room. Based on a similar figure for 2018 for the subject hotel, he estimated expenses in this category would be 9% of total revenue or $1852 per room.[13] Next is information and telecommunications expenses. Averaging one comparable hotel, four limited service categories, and actual expenses for the subject hotel over the last three years, he reached 1.1% or $320 per room. Because the subject hotel's expense for this category was 1.5% of total revenue in 2018, Heyde used that figure for 2019 as well, resulting in expenses of $309 per room.[14] Then comes marketing expenses. Averaging five Midwest comparables, four limited service categories, and actual expenses for the subject hotel over the last three years, he reached an average of 3.6% or $1092 per room. Given new competition in Council Bluffs he predicted the subject hotel's would be 4% of total revenue or $823 per room.[15] For franchise fees, Heyde averaged the same indicators and reached 7.7% or $2158 per room. Given this

---

[12] The product of other department revenue of $51,626 and .65 ($33,557), divided by 151 rooms, in turn equaling $222, rounding down.

[13] The product of total revenue of $3,106,684 and .09 ($279,602), divided by 151 rooms, equaling $1852, rounded up.

[14] The product of total revenue of $3,106,684 and .015 ($46,600), divided by 151 rooms, equaling $309, rounded up.

[15] The product of total revenue of $3,106,684 and .04 ($124,275), divided by 151 rooms, equaling $823, rounded down.

average and the subject hotel's historical similar expenses he projected the subject hotel's expense would be 7.7% of total revenue or $1584 per room.[16] For utilities, the same factors were considered, resulting in an indicator average of 4.3% or $1251 per room. Because it was near the average of the subject hotel's three-year average and median of all indicators, Heyde estimated expenses of 3.7% of total revenue or $761 per room.[17] As to property operation and maintenance, Heyde considered the same indicators resulting in 4% or $1140 per room. Heyde predicted the subject hotel would expend 4.5% of total revenue on this item, or $926 per room.[18] For management fees, Heyde considered the same factors and reached an average of 3.1% or $1077 per room. He projected the subject hotel's expenses would be 3% or $419 per room, but that per-room figure should have been $617 using those whole numbers.[19] As to fixed expenses, including insurance but not property taxes, Heyde reached an average of 1.2% or $350 per room. Heyde estimated a slight increase from 1.5% in 2018 to 1.7% in 2019, or $350 per room.[20] Lastly, various data indicated an average of 4% to 4.4% being used for reserves for replacing furniture, fixtures, and equipment. He estimated

---

[16] The product of total revenue of $3,106,684 and .077 ($239,215), divided by 151 rooms, equaling $1584, rounded down.

[17] The product of total revenue of $3,106,684 and .037 ($105,627), divided by 151 rooms, equaling $764, rounded down.

[18] The product of total revenue of $3,106,684 and .045 ($$139,801), divided by 151 rooms, equaling $926, rounded up.

[19] The product of total revenue of $3,106,684 and .03 ($93,201), divided by 151 rooms, equaling $617, rounded down.

[20] The product of total revenue of $3,106,684 and .017 ($52,814), divided by 151 rooms, equaling $350, rounded up.

the subject hotel's expense to be 4%, and a later table provided this would be $823 per room.[21]

Based on the foregoing figures, Heyde reached a revenue-less-expenses figure of $1,055,277, or $6989 per room.[22] The next step was to select the appropriate capitalization rate among three approaches: comparable sales, investor surveys, and band of investment. For comparable sales, eleven comparable sales since 2016 indicated "stabilized overall rates ranging from 8.22% to 13.65%, with an average of 10.022% and a median of 9.47%." Despite the subject hotel's upscale nature and chain stature, Heyde concluded the rate under this approach should be between 10% and 11% given the underperforming market, need for renovations, and new competition. Capitalization rates for the investor surveys approach, Heyde concluded the same rates were appropriate, between 10% and 11%. He reached a figure of 10.14% under the band of investment technique. Based on these figures, he concluded application of a 10.50% rate was appropriate. He then increased that figure by the effective tax rate in 2018, 4.0651%, for a loaded capitalization rate of 14.57%. Heyde reached a preliminary value as a going concern by computing the quotient of net income ($1,055,277) and the loaded capitalization rate (.1457), which equals just under $7,250,000.[23] He then subtracted the amount of renovations required under the

---

[21] The product of total revenue of $3,106,684 and .04 ($93,201), divided by 151 rooms, equaling $823, rounded up.

[22] Based on the numbers provided by Heyde, aside from a minor deviation or two, our calculation is in the same ballpark. *See* Attachment A. Factoring in Heyde's miscalculation on management fees would result in an increase in expenses of $29,932 and a corresponding decrease in net income.

[23] $7,242,807.14 to be exact.

franchise contract ($370,000), to reach a final going-concern value of $6,880,000 under the income capitalization model.

Heyde testified he did not limit his assessment to the sales-comparison approach because it would potentially be inaccurate because of the complexity of the hotel business and utilizing multiple methods provides for cross-verification between different methods.

Each of the foregoing assessments included both real and personal property. The personal property includes furniture, fixtures, and equipment (FFE), which is generally part of the sale, but is not assessed for real estate tax purposes. Based on data from various resources, Heyde concluded the "cost new" value of the FFE in the subject hotel was $23,000 per room, or $3,473,000 in total. Applying a resale discount of 20% resulted in a resale cost of $2,778,400. Based on the average age of the FFE of seven years and the economic life of ten years, that figure was reduced by 70%, resulting in a final FFE value of roughly $830,000.

Lastly, Heyde reconciled his findings among the valuation assessments— $7,180,000 under the sales-comparison approach,[24] $6,620,000 under the GRM approach, and $6,880,000 under the income-capitalization approach. He testified he gave the greatest weight to the income-capitalization approach because it best reflects this type of property. So he valued the property, including FFE, at $6,880,000. Extracting the value of FFE in the amount of $830,000, he reached a final valuation of $6,050,000.

---

[24] While the final chart provides a value of $7,330,000, this is inconsistent with the remainder of the report.

The Board's expert was Christopher Mustoe, a real estate appraiser of roughly thirty-five years and owner of a full-service real estate appraisal company. For his assessment, Mustoe considered the sales-comparison approach and the income-capitalization approach. For sales comparison, Mustoe considered four comparable sales in the Council Bluffs/Omaha area:

|  | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|
| Sale Date | 2018 | 2018 | 2018 | 2017 |
| Year Built | 1997 | 2008 | 1997 | 1998 |
| Rooms | 66 | 113 | 87 | 79 |
| Sale Price | $3,000,000 | $10,800,000 | $4,025,000 | $4,700,000 |
| Per-Room Value | $45,455 | $95,575 | $46,264 | $59,494 |
| Building Square Footage | 33,760 | 58,667 | 47,500 | 42,831 |
| Per-Square-Foot Cost | $89 | $184 | $85 | $110 |

Based on the relevant differences between the subject property and the comparables, Mustoe made various adjustments.[25] He testified he tries to find sales as recent as possible, such as the sales of the comparables above, so any time adjustment is nominal. Based on the timeframe of the sales, he did not make an adjustment for time. Because there were no meaningful differences between the subject hotel and comparables on the issues of property rights conveyed, financing terms, conditions of sale, market conditions, access and visibility, building size, or FFE, he made no adjustments for those categories. As to location and associated land value, because the first and third comparables were further from entertainment and attractions he assigned upward adjustments of 10%.

---

[25] Adjustment categories included property rights conveyed, financing terms, conditions of sale, market conditions, location, access and visibility, building size, age and condition, land to building ratio, FFE, and flag affiliation. The only categories that had more than nominal differences and warranted adjustments were location, age and condition, land-to-building ratio, and flag affiliation.

Because the second was located in an entertainment district, a downward adjustment of 30% was assigned. The difference between the fourth comparable and the subject hotel was only nominal, so no adjustment was made. As to age and condition, the first comparable had no remodeling or renovations, so an upward adjustment of 25% was assigned, the difference as to the second was only nominal so no adjustment was made, and the limited renovations to comparables three and four resulted in upward adjustments of 20% and 5%, respectively. For land to building ratio the only adjustment Mustoe made was a downward adjustment to the first comparable in the amount of 5%. Lastly, Mustoe concluded, "The subject facility has a flag affiliation considered comparable to that of Sale 2, but superior to the other three sales, adjusting them up[, s]ale 1 and 4 by 10% and Sale 3 by 5%."

Mustoe based his final valuation on a price-per-square-foot approach. The following chart details the unadjusted price-per-square-foot cost, aggregate adjustments, and resulting adjusted cost per square foot:

|  | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|
| Per-Square-Foot Cost (Unadjusted) | $89 | $184 | $85 | $110 |
| Aggregate Adjustment | 40% | (30%) | 35% | 15% |
| Per-Square-Foot Cost (Adjusted) | $125 | $129 | $115 | $126 |

These figures result in a mean of $124, with a standard deviation of $6, resulting in an adjusted price-per-square-foot range of $121 to $127. Multiplying these

figures by the subject property's square footage of 86,325, Mustoe determined the subject hotel's value was between $10,450,000 and $10,960,000.[26]

Next, Mustoe considered the income-capitalization approach. Historical data retrieved by Mustoe showed the following figures for the subject hotel as to occupancy, ADR, and RevPAR:

| Year | Occupancy | ADR | RevPAR | Room Revenue[27] |
|------|-----------|-----|--------|--------------|
| 2015 | 66.9% | $92.95 | $62.19 | $3,427,246 |
| 2016 | 64.2% | $97.56 | $62.55 | $3,452,046 |
| 2017 | 59.6% | $95.73 | $57.04 | $3,144,591 |
| 2018 | 59.5% | $93.03 | $55.34 | $3,050,772 |

Based on this historical data, together with trends, Mustoe used a stabilized occupancy of 62% and an ADR or $98, which would amount to a RevPar of $60.67, and $3,348,787 in annual revenue.

Mustoe also analyzed the subject hotel's historical overall revenue, departmental expenses, undistributed expenses, management fees, fixed expenses not including taxes, replacement reserves, and resulting net income:

| | 2015 | 2016 | 2017 | 2018 (budgeted) |
|---|------|------|------|-----------------|
| Dep't Revenue | $3,516,547 | $3,537,673 | $3,222,920 | $3,694,973 |
| Dep't Expenses | ($955,980) | ($1,109,096) | ($1,076,154) | ($1,131,406) |
| Undistrib. Expenses | ($788,502) | ($898,401) | ($848,189) | ($930,580) |
| Management Fee | ($105,994) | ($106,155) | ($96,688 | ($110,849) |
| Fixed Charges | ($52,747) | ($57,695) | ($60,589) | ($53,835) |
| Replacement Reserves | -- | -- | -- | ($184,749) |
| NET INCOME | $1,613,324 | $1,366,326 | $1,141,300 | $1,283,554 |

---

[26] The former was rounded up to the nearest $10,000 mark, while the latter was rounded down to the nearest $10,000 mark.

[27] We calculate these figures by taking the product of ADR, 151 rooms, occupancy, and 365 days per year.

Based on historical performance overall, Mustoe predicted room revenue to be $3,348,787; additional revenue to be $120,000; departmental expenses to be $1,040,636 (30% of total revenue); undistributed expenses to be $849,853 (35% of departmental profit); management fees to be $104,064 (3% of departmental revenue); fixed charges to be $60,000; and replacement reserves to be $47,349 (3% of gross operating profit), resulting in a net income of $1,366,885.

Mustoe considered four indicators on capitalization rate which resulted in rates of 10%, 8.8%, 7.73%, and 7.27%. Considering all risk factors, Mustoe found a capitalization rate of 8.8% to be appropriate. Like Heyde, Mustoe added a tax rate load of 4.07% to the capitalization rate to reach a loaded capitalization rate of 12.87%. Mustoe then reached a preliminary value as a going concern by computing the quotient of net income ($1,366,855) and the loaded capitalization rate (.1287), which equals $10,620,707.

Relying on an appraisal manual Mustoe reduced all of the subject hotel's FFE to a per-room variable of $20,000 and applied 70% depreciation to reach a per-room value of $6000, which amounts to $906,000 for the entire hotel. For his end reconciliation, Mustoe valued the hotel as a going concern at $10,600,000 and reduced that figure by $906,000 for FFE to reach a value of $9,694,000 for real property. Mustoe did not include the cost for upcoming renovations under the franchise agreement in his valuation.

In his report, Mustoe explained the sales-comparison approach begins to lose its reliability when adjustments to comparables are numerous, but it nevertheless should be "given weight together with the income capitalization approach." He explained most knowledgeable hotel buyers would base their

decisions on net income and return on investment, and "the income capitalization approach produces the most supportable value estimate and is given the greatest weight in valuation process for the subject property."

The following summarizes the experts' valuations, excluding FFE, based on the approaches utilized:

| | Heyde | Mustoe |
|---|---|---|
| Sales Comparison | $6,350,000 | $9,544,000—$10,054,000 |
| Gross Revenue Multiplier | $5,790,000 | -- |
| Income Capitalization | $6,050,000 | $9,694,000 |

Gary Scott, a commercial appraiser employed with the county assessor's office, also testified. He testified the subject hotel was assessed at $9,595,700 in 2017 and that assessment has not changed since. From 2010 to 2016, it was assessed at $9,000,000. According to Scott, the 2018 sale of the hotel to La Posada was not considered a "normal transaction" by the Iowa Department of Revenue because it was an "allocation sale" of six properties.

Ultimately, a trial was held in October 2020. Because the sale of the property to La Posada was not a normal transaction, the court declined to consider the sale price of $5,600,000 as competent evidence on the issue of value. *See* Iowa Code § 441.21(1)(b)(1) (2019) ("[S]ale prices of property in abnormal transactions not reflecting market value shall not be taken into account . . . ."). However, the court concluded that expert testimony offered by La Posada satisfied the "competent evidence" requirement of the statute to show the market value is less than the assessed value, thus shifting the burden of proof to the Board. *See* *id.* § 441.21(3)(b)(2). After considering all the evidence, the court found that the market value could be determined by the sales-comparison approach, and

resorting to that method for valuation was therefore mandatory. The court questioned Heyde's decision to expand the geographic search area for comparable sales and found certain aspects of his analysis flawed. As a result, the court found Heyde's valuation lacking in credibility. Based on the range provided by Mustoe under the sales-comparison approach, which encompassed the assessed value, the court found the Board met its burden to show the assessed value is the market value and affirmed the assessment. The court denied La Posada's motion to reconsider, enlarge, or amend.

La Posada appeals.

## II.     Standard of Review

Appellate review of tax disputes is de novo. *Compiano v. Bd. of Rev. of Polk Cnty.*, 771 N.W.2d 392, 395 (Iowa 2009). We give deference to the district court's findings of fact, but we are not bound by them. *Wellmark, Inc. v. Polk Cnty. Bd. of Rev.*, 875 N.W.2d 667, 672 (Iowa 2016). "We are especially deferential to the court's assessment of the credibility of witnesses." *Id.* "To the extent we are asked to engage in statutory interpretation, our review is for correction of errors at law." *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 289 (Iowa 2017).

## III.    Analysis

### A.     Valuation Method

First, La Posada argues the "court erred in determining it could not consider valuation evidence outside the sales-comparison approach to value," claiming "[t]he evidence demonstrated that the income approach to value provided the better indicator of value for the subject property."

La Posada's expert provided evidence on three different valuation methods: sales comparison, gross revenue multiplier, and income capitalization. He opined the latter method was the best indicator for the value of the property. The Board's expert generally agreed. La Posada argues the district court erred in concluding it could not consider valuation evidence outside the sales-comparison approach and submits other valuation methods may be utilized to check the viability of a valuation in which the sales comparison method is used.

Iowa Code section 441.21 provides:

> 1. a. All property subject to taxation shall be valued at its actual value which . . . shall be assessed at one hundred percent of its actual value, and the value so assessed shall be taken and considered as the assessed value and taxable value of the property upon which the levy shall be made.
> b. (1) The actual value of all property subject to assessment and taxation shall be the fair and reasonable market value of such property except as otherwise provided in this section. "Market value" is defined as the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property. Sale prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or unavailability of persons interested in purchasing the property, shall be taken into consideration in arriving at its market value. . . .
> . . . .
> 2. In the event market value of the property being assessed cannot be readily established in the foregoing manner, then the assessor may determine the value of the property using the other uniform and recognized appraisal methods including its productive and earning capacity, if any, industrial conditions, its cost, physical and functional depreciation and obsolescence and replacement cost, and all other factors which would assist in determining the fair and reasonable market value of the property but the actual value shall not be determined by use of only one such factor. . . .

La Posada argues value could not be "readily established" under the sales-comparison approach due to the nature of the property, so the court could have considered other valuation methods.

"The assessor is guided by certain statutory requirements in determining the market value of real estate . . . ." *Compiano*, 771 N.W.2d at 396. "One of the statutory requirements is the assessor must use the comparable-sales approach to the valuation of real estate when comparable sales are available." *Id.* "An assessor can resort to the other methods of valuation only when comparable sales cannot readily be established." *Id.* "[T]he alternative methods to the comparable sales approach to valuation of property cannot be used when adequate evidence of comparable sales is available to readily establish the market value by that method." *Id.* at 398. There must be a showing "that evidence of comparable sales was not available to establish market value under the comparable-sales approach before the other approaches to valuation become competent evidence in a tax assessment proceeding." *Id.*

True, both experts testified the income-capitalization approach was the best indicator of value for a hotel. That said, both experts identified comparable sales and used them to reach valuations under the sales-comparison approach. This was not a situation where "evidence of comparable sales was not available to establish market value under the comparable-sales approach," so the other methods for valuation were not competent evidence of value under the statutory scheme. *See id.* While the income-capitalization approach may be a better indicator of value, "[t]he legislature has expressed a preference for valuations

based on comparable sales" when that information is available. *Soifer v. Floyd Cnty. Bd. of Rev.*, 759 N.W.2d 775, 778 n.2 (Iowa 2009).

La Posada goes on to argue "[o]ther methods of valuation may be used to check the viability of a value conclusion derived through the sales comparison approach to value," urging "there is nothing about Iowa Code section 441.21(1)(b)(1) that demands the exclusion of other evidence or other factors from the court's consideration." But, as explained, evidence of value under other methods for valuation do not become competent evidence on the issue of value unless evidence of comparable sales is not available. While La Posada cites *Heritage Cabletelevision v. Board of Review of City of Mason City* to support its claim on "[t]he advantage of using multiple appraisal techniques," that case involved a situation where value could not be readily established based on comparable sales alone. 457 N.W.2d 594, 597–98 (Iowa 1990). Here, in contrast, each expert reached independent valuations considering comparable sales under that approach alone. We find no error in the district court's decision to limit its determination to the sales-comparison approach, and we affirm on this point.

B. Sufficiency of Evidence

Next, La Posada argues the court erred in concluding the Board "met its burden of proving its value conclusion was superior to La Posada's." A taxpayer challenging an assessment has the burden to prove a ground of protest, such as an excessive assessment, by a preponderance of the evidence, after which the burden of proof shifts to the party seeking to uphold the valuation to be assessed. Iowa Code § 441.21(3)(b)(2); *see Compiano*, 771 N.W.2d at 396–97.

La Posada complains the court focused on errors made by Heyde in concluding the Board met its burden of proof. As to the court's assessment of the competing valuations, generally speaking, the court found Mustoe's sales-comparison analysis more credible because it considered comparable sales in the Council Bluffs and Omaha area, while Heyde, without meaningful explanation, considered sales across the Midwest and in different markets. True, the court found Heyde's third comparable sale not similar to the subject hotel and found his use of the fourth sale flawed because it did not include FFE. But Heyde assigned a large adjustment to the third sale, and he acknowledged in his own testimony that, "the higher the adjustment, the less similarities there are for the properties." *Accord Bartlett & Co. Grain v. Bd. of Rev. of City of Sioux City*, 253 N.W.2d 86, 93 (Iowa 1977) ("[A]s differences increase the weight to be given to the sale price of the other property must of course be correspondingly reduced."). In any event, we have considered sale three in our de novo review of the record and in reaching our decision. As to the fourth sale, even if the court would have corrected Heyde's calculation, as La Posada seems to request, it would have only served to increase Heyde's overall valuation and would not have supported La Posada's case for its requested assessment value.

Next, La Posada contends Mustoe's report "contained significant errors" and was formulated without his knowledge of critical information. But most of these complaints concern Mustoe's income-capitalization analysis, not the relevant sales-comparison analysis. La Posada does complain Mustoe did not confirm whether the reported sale prices of two of the comparable sales included FFE. But that alleged deficiency posed no detrimental consequence to La Posada. Even if

those sale prices did not include FFE, then correcting the error would have only increased the comparable sale prices and, as a result, the valuation of the subject hotel. In addition, the adjusted per-square-foot cost for the comparables reflected similar going-concern sales, and an individualized assessment of the subject hotel's FFE was conducted and subtracted to reach taxable value. We acknowledge Mustoe did not consider renovation requirements following the sales of the comparable property, but he also did not consider any such requirements as to the subject hotel. Both experts testified on various occasions that information on certain variables was simply not available to them. And the appraisal process is far from an exact science or mathematical exercise. *Wellmark*, 875 N.W.2d at 672. That said, the evidence was pretty much undisputed that renovations required for the subject hotel would affect how much a buyer is willing to pay, and Heyde testified renovation costs put "downward pressure on the sales price" if they are required to be completed within twelve to eighteen months of the sale. The evidence shows small renovations costing $370,000 were required in 2019 under the franchise agreement associated with the sale, with more significant renovations being required in 2021. But, as discussed below, this was not a normal transaction, so the details of the sale should not be considered. *See* Iowa Code § 441.21(1)(b)(1).

Next, while La Posada claims Mustoe's adjustments to comparable sales were excessive, it offers no reason why. To the extent adjustments were required to get the comparable sales on the same level as the subject hotel, this was done for the purpose of analyzing sales in the same geographic market as the subject

hotel, as opposed to analyzing hotels in different geographic markets and still making large adjustments, as Heyde did.

Lastly, La Posada argues, "The subject property's sale price allocation should be considered." It claims the experts were required by appraisal standards to consider all sales of the subject property in the prior three years and the experts agreed the October 2018 sale was an arm's-length transaction. Iowa Code section 441.21(1)(b)(1) allows for consideration of "[s]ale prices of the property . . . in normal transactions reflecting market value" but prohibits consideration of "sale prices of property in abnormal transactions not reflecting market value" unless "adjusted to eliminate the effect of factors which distort market value." A representative from the assessor's office unequivocally testified the sale was not considered a normal transaction by the Iowa Department of Revenue because it was an allocation sale of six properties. The department did not consider it a "good sale" based on a ratio between the sale price and assessed value. A number of other hotels in the area were sold over the last few years, and all were considered good sales based on the ratio employed by the department. La Posada argues the department employs the ratio to determine the viability of a sale from an equalization standpoint, and it does not relate to market value. But the fact that other sales were effectuated near the assessed value of the property and the subject hotel shows the sale was not normal based on the market. So we agree with the district court that it should not have been considered.

At the end of the day, this case boiled down to a battle of the experts. While each expert's opinions contained flaws, "the trial court is in a much better position to weight the credibility of the witnesses than we are, and we will give weight to the

trial court's decision on credibility even in a de novo review." *Excel Corp v. Pottawattamie Cnty. Bd. of Rev.*, 492 N.W.2d 225, 229 (Iowa Ct. App. 1992). The court implicitly found Mustoe's opinion more credible and, because the assessed value was within the range reached by Mustoe, the court affirmed the assessment. Upon our de novo review, we affirm the district court. *See* Iowa Code § 441.43.

**AFFIRMED.**

Attachment A

| Revenue | Rooms | $3,036,837 |
|---|---|---|
| | Food and Beverage | $18,221 |
| | Other Departments | $51,626 |
| | **TOTAL REVENUE** | **$3,106,684** |
| **Expenses** | Room Expenses | $819,946 |
| | Food and Beverage | $12,755 |
| | Other Departments | $33,557 |
| | Administrative and General | $279,602 |
| | Information and Telecommunications | $46,600 |
| | Marketing | $124,267 |
| | Franchise Fees | $239,215 |
| | Utilities | $114,947 |
| | Operation and Maintenance | $139,801 |
| | Management Fees | $63,250[28] |
| | Fixed Expenses (Insurance) | $52,814[29] |
| | Reserve Replacements | $124,267 |
| | **TOTAL EXPENSES** | **$2,051,021** |
| | **NET INCOME** | **$1,055,663** |

---

[28] Using Heyde's per-room prediction of $419 would result in an expense figure of $63,269. As noted, the 3% variable he reached should have resulted in a total expense of $93,201.

[29] Heyde's chart had $53,200 for a total expense on this item.